PACIFIC INSURANCE CO. (HURLBERT v.). See Case No. 6,919.

PACIFIC MAIL STEAMSHIP CO. (BROWN v.). See Case No. 2,025.

PACIFIC MAIL STEAMSHIP CO. (RICHARDSON v.). See Case No. 11,793.

———

## Case No. 10,648.

PACIFIC MAIL STEAMSHIP CO. v. TEN BALES GUNNY BAGS.

[3 Sawy. 187.] [1]

District Court, D. California. Oct. 23, 1874.

SALVAGE.

Sixteen thousand dollars awarded as salvage compensation, where both vessels belonged to the same owners.

[Cited in The Colima, Case No. 2,996; The Colon, Id. 3,024; Brooks v. The Adirondack, 2 Fed. 390; A Lot of Whalebone, 51 Fed. 924.]

Libel for salvage.

McAllisters & Bergin, for libellants.

Milton Andros, for claimant.

HOFFMAN, District Judge. About one one o'clock in the afternoon of March 15, 1874, as the steamer Colima was prosecuting her voyage from Panama to this port, a sudden jar or shock was felt, followed by the immediate stoppage of her engines. On examination it was found that three blades of her propeller were broken, and that her steam motive power was, in consequence, unavailable.

Sail was at once made upon the ship and she was headed for the land. About six in the evening she came to anchor under Cerros island, distant southerly from the port of San Diego about 292 miles, and from Cape St. Lucas, northerly, about 420 miles. An officer was immediately sent ashore to hoist a signal of distress on the island, and in the morning a boat was dispatched for San Diego with instructions to intercept and send to the assistance of the Colima, any steamer that might be fallen in with, or, in case none was met, to proceed to San Diego and communicate by telegraph with the agents of the Pacific Mail Steamship Company, at this city. On the succeeding day another boat was dispatched southward to Cape St. Lucas with similar instructions as to any steamer which might be met.

The latter, after a navigation of several days, fell in with the steamship Arizona,

———

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

bound for San Francisco, and the master, on learning the situation of the Colima, proceeded without delay to Cerros island, where he arrived on the morning of the 25th. Preparations were at once made for towing the Colima, and on the evening of the same day the vessels started for this port, where they arrived on the morning of March 30. The distance from Cerros island to San Francisco is about 730 miles. The voyage of the Arizona was lengthened by her entering upon the service some two and a half or three days.

Her deviation was not considerable, as the usual course of steamers along the coast is, in fine weather, not far from the island, and such was in fact the position of the Colima when the accident occurred. Both vessels belonged to the same owner, the Pacific Mail Steamship Company, and the present suit is brought against a portion of the cargo of the Colima for a salvage compensation, with the understanding that the court shall determine the whole amount of salvage, if any, to be paid by the cargo; such amount to be afterwards apportioned amongst the shippers, according to their respective interests.

The cause of the accident is somewhat obscure. On examination here, it was found that out of the four blades of her propeller, three were entirely gone, and of the fourth one-half remained. The external appearance of the casting indicated no defect, but on close inspection of the iron at the place of fracture it was found to be slightly porous or honey-combed, showing an original defect in the manufacture. The experts testified that they knew of no test by which this defect could have been detected.

The vessel, with the same propeller, had very recently made a voyage from New York to this port without accident. She had then proceeded to Panama, and had accomplished about three-quarters of her return trip, when the accident occurred. At the time it happened, the sea was calm and the weather moderate. The vessel was going at her usual rate of speed.

That the defect in the casting impaired the strength of the propeller is obvious, but whether sufficiently so to account for its breaking under the circumstances, the engineer was unable to form an opinion. If the defect was such as to render the vessel unseaworthy from the time she was built, it is difficult to understand why it did not sooner disclose itself; on the other hand, if it was not, it is equally difficult to account for the accident. No rocks or other objects upon which the propeller might have struck are known to exist in the part of the ocean where the accident occurred. The advocate for the claimant contends that the accident was caused by a latent defect in the means employed by the carrier, the consequences of which the law requires him to bear. That this defect constituted a breach of his implied warranty of seaworthiness of the ship, and that as the carrier and the salvor are the same corporation,

he cannot recover as salvor a compensation from the shipper, which he would, as carrier, be obliged to reimburse.

In the view I take of this case, it is unnecessary to determine whether the accident was solely caused by the defect in the propeller, and whether that defect was such as to render the vessel unseaworthy, and the carrier liable for its consequences under the rules of the common law by which the liabilities of carriers are determined.

The cargo of the Colima was shipped under bills of lading which provided, among other things, that the vessel should not be liable "for accidents, loss and damage from machinery, boilers and steam, or from accidents or perils of the seas, or of land and rivers, or of sail or steam navigation, of whatever kind or nature whatsoever."

Although these stipulations would not avail to exonerate the carrier from liability for damages caused by his actual negligence, yet, if they are to have any force at all, they must exempt him from liability for the consequences of a secret defect which no diligence could discover or guard against, and where the previous history of the vessel afforded the strongest grounds for the belief that it could not exist. The point was expressly ruled in the case of the Miranda, 4 Mar. Law Cas. 440, after extended argument.

That case bears in all its details so striking a resemblance to the cases at bar, that if its authority be admitted, it is decisive on every point raised in the latter. The Miranda, like the Colima, became disabled at sea by an accident to her machinery, and was towed into port by the Roxana, a vessel belonging to the same owners. The value of the property was considerable, and service occupied about two days. The owners of the Roxana claimed salvage on the cargo of the Miranda. It was contended for the defence:

1. That the owners of the Roxana were bound to carry and deliver the cargo laden on board the Miranda, to London. That they would not have fulfilled this contract unless they had rendered assistance to the Miranda, and that this assistance must therefore be considered as an act done for the sole benefit and advantage of the owners of the Roxana.

2. That implied in the contract between the owners of the Roxana and the owners of the cargo of the Miranda, there was a warranty of the seaworthiness of the Miranda. That the accident arose from the breach of such warranty. And that the owners of the Roxana were therefore liable for all the consequences of such breach, and so were not entitled to salvage remuneration for averting a loss which, if it had happened, would have fallen on themselves.

Both of these defences were overruled. As the first was not insisted on at the argument of the cases at bar, it is unnecessary further to advert to it. The state of facts under which the second defence was interposed,

was identical with those in the case of the Colima.

The shaft of the Miranda broke in fair weather and without any assignable cause, except a latent defect existing at the commencement of the voyage. The bill of lading contained a clause exempting the vessel from liability for non-performance of the contract, caused by "accidents, or damage from machinery, boilers and steam." The terms of the bills of lading in the cases at bar are "accidents, loss and damage from machinery, boilers and steam."

As to the nature of the exemption thus created, Sir R. Phillimore, delivering the judgment of the court, said: "But I think the true question in the case is, does the exception 'accidents from machinery,' include the present case? I must come to the conclusion that the accident in question finds its place among the excepted perils; it is, therefore, unnecessary for me to discuss the able argument which has been addressed to the court with respect to a warranty of seaworthiness being implied in the contract."

The libellants in the case at bar being thus found not to be liable as carriers for the consequences of the accidents to the machinery, they are entitled to claim as salvors a reasonable compensation for their service to the cargo. The amount to be allowed will be determined on a consideration of all the circumstances.

The Colima, at the time she was taken into tow by the Arizona, though not in immediate peril, was in an exposed and somewhat dangerous position. If a gale from the south or southeast had suddenly arisen, she would, in all probability, have gone ashore. And even if it had come on gradually there is some doubt whether she would have been able to put out to sea. Capt. Lappidge is of opinion that she could not have done so; but this opinion involves the supposition that her master voluntarily put her in a position from which it was impossible with any wind to extricate her. I incline to think, therefore, that under favorable circumstances she might have succeeded in getting to sea. She would thus have avoided an impending shipwreck, but she would not have secured her final safety—nor the accomplishment of her voyage. With the winds which prevail at that season of the year, an attempt to reach San Francisco by the use of her sails would have been hazardous—it could, if practicable at all, have been accomplished only after a protracted voyage, before the expiration of which her provisions would have been exhausted. She had on board 285 passengers and the ship's crew.

The entire cargo was destined for San Francisco. Its delivery at the earliest practicable moment was, no doubt, of great importance to its owners. To reach its destination at all it must either have been transhipped, or the vessel on which it was laden must have been towed up, as was in fact done, and by this means it arrived after a detention far less than would otherwise have been incurred.

All these ingredients constitute a meritorious salvage service, from which the owners of the cargo have derived great benefit. "On the other hand, I must remember" (applying the language of Sir R. Phillimore, in The Miranda, mutandis mutatis, to this case), "that the Colima was owned by the owners of the Arizona; that the owners of the Arizona were earning freight for the carriage of the cargo of the Colima; that no material deviation occurred to the Arizona as she towed the Colima to the port to which she was herself bound. I must also bear in mind that the weather was, with some inconsiderable exceptions, fine, and that there was no appreciable danger."

It must also be remembered that San Francisco was the only port on the coast where the Colima could be repaired, and that for that purpose she must necessarily have been towed thither. The interest of the owners as well as regard for the safety of the passengers, would have required them to accept the services of the Arizona, even if there had been no cargo on board.

Another consideration is, I think, entitled to much weight. The Pacific Mail Steamship Company is the owner of a fleet of steamships plying regularly between this port and Panama. Except when they avoid the land during fogs, their course is, probably, nearly uniform, and confined within a comparatively narrow belt of the ocean.

In case of accident they may count with tolerable certainty upon being able to intercept and obtain assistance from other vessels of the line. If such assistance when afforded is to be accounted a salvage service of a high order of merit, and to be compensated as if rendered by a stranger vessel, a direct encouragement is held out to the company to relax the diligence which it is their duty to exercise, and to send their vessels to sea with imperfect or unreliable machinery.

Actual negligence can rarely be proved, for the best machinery is liable to accidents. And the company might in almost every instance demand and receive a salvage compensation for performing a service, the necessity for which arose from the negligence of its agents, and the inconvenience of affording which, falls chiefly, if not exclusively, on the passengers and owners of the cargo on board the salving vessel.

The service seems to have been somewhat severe and straining upon the Arizona. She sustained, however, no serious injury, although repairs were necessary to remedy some derangement to her machinery. The cost of these is not shown. It was, probably, inconsiderable.

In the case of The Miranda the value of the ship was £15,000; of the cargo, £18,755; of the freight in course of being earned, £1,875; total, £35,630, stated by Sir R. Phillimore as about £36,000, or $180,000. On this value he

decreed £350, less than one per cent., and this allowance included compensation for the loss of a hawser valued at £45.

The estimated value of the Colima is $500,-000; of her cargo, $700,000; freight, $40,000, in gold. But in this estimate the market value of the cargo is given. It should, therefore, be reduced by deducting the freight. The total contributory value will, therefore, be about $1,200,000. The Roxana was delayed on her voyage forty hours, the Colima from two and a half to three days. The value of the coal consumed by the Roxana during her forty hours' detention was about $190. The value of the coal consumed by the Colima during two and a half days was from twelve to eighteen hundred dollars.

Guided by the analogies afforded by the case so often cited, I shall award the sum of $16,000 to be paid by the owners of the cargo laden on board the Colima.