Choate, D. J.
This is a libel brought by the master of the steamer Plainmeller to recover against the steamer Adirondack the sum of £é,000 sterling, upon an express agreement in writing made by the master of the latter steamer to pay that sum for a salvage service. The defence is that the amount agreed upon is exorbitant and unreasonable; that the contract was entered into improvidently, and under circumstances of distress which render it invalid as a contract. And the claimants, admitting that the service rendered was a salvage service, offer to pay $7,500, of which they have made a tender, and which they insist is a full and just salvage compensation.
The Plainmeller was a steamer of 1,106 tons register. She was bound from Hull, England, to Philadelphia, in ballast, under a charter to load there with grain for Europe. The Adirondack was a steamer of 1,302 tons register. She was bound from New York to Liverpool. Her cargo consisted of cotton, grain and salt beef. The value of the vessel and cargo was $300,000. The present value of the Plainmeller is not proved, but she cost in 1877, when she was built, £31,000, and that may be taken as her value approximately for the purposes of this case.
The Adirondack had compound nautical engines of 225 *388 horse-power. On the second day of October, 1879, about 8 o’clock in the evening, the low-pressure piston broke, knocking out the cylinder bottom, knocking down the escape valve and the stuffing box, and bending the piston-rod. This rendered the low-pressure ■ cylinder useless, and, for the time being, she was entirely disabled in her machinery. The high-pressure cylinder was 'uninjured, but could only be brought into use by at least two days’ work. It would, however, have been practicable in two or three days, with the appliances on board, to have got the ship under steam with the use of the remaining engine. In fact, she afterwards crossed the Atlantic with the use of that. engine alone. After the accident they disconnected the propeller, and attempted to proceed under sail, but in this they do not seem to have succeeded. She had two masts, with square sails on the foremast, and fore and aft sails on the mainmast.
I think the evidence will not warrant the conclusion that she could have made her port under sail alone. She burned blue lights as a signal of distress, which were seen by the Plainmeller about 2 o’clock on the morning of the third of October. When first seen she bore a little on the port bow of the Plainmeller. It was a clear moonlight night. The place where the vessels met was latitude 40 degrees, 24 minutes, north; longitude 59 degrees, 44 minutes, west, or very near that. The nearest port was Halifax, about 450 miles distant. The distance to New York was about 662 miles. The drift of the gulf stream at that point is a little to the southward ,of east, and the Adirondack was drifting to the southward .of' the usual track of westward bound vessels. The Plainmeller came up under the stern of the Adirondack, and hailed her. The master of the Adirondack told the master of the Plainmeller that his machinery was disabled, and asked what he wo.uld tow him into Halifax for.. The master of the Plainmeller at first named £5,000, and then £4,000, for either Halifax or New York. The master of the Adirondack offered £1,000, refused the offer of £4,000, and told the .master of the Plainmelier to report him in New York. The Plainmeller, however, stood by her, drifting away and,.coining,up again three *389 times under her stern; and the fourth time she came up, upon the invitation of the master of the Plainmeller, the master of the Adirondack came off in his boat and came on board the Plainmeller. The captains had a brief conference on deck.
The captain of the Plainmeller asked the other captain if he was entirely disabled, and the captain of the Adirondack-explained that his engineer said they could get up steam again in two days. They had some haggling about the price. The captain of the Plainmeller insisted that ¡64,000-was a fair and reasonable amount, and refused to tow her in for less. He testified that he offered to do it for that, or to-leave the amount open. This is denied by Captain Roberts, of the Adirondack, and I am not able, on the whole evidence, to find it proved. No inquiry was made as to the value of the-cargo of the Adirondack. Captain Roberts finally consented to the price of ¡64,000, and they went into the cabin to-reduce the agreement to writing, but, when they got there, Captain Brooks, of the Plainmeller, said it required consideration to word it properly, and suggested that he would have-the paper drawn up and send it on board the Adirondack for signature. To this Captain Roberts assented, and this-was done after daylight, on the third of October. The agreement bound the owners of the Adirondack to pay to the master and owners of the Plainmeller ¡64,000 sterling, “provided the aforesaid ship tows the Adirondack to within a safe distance of the port of New York.” It recites that the Adirondack was “totally disabled in her machinery.” After making-the agreement the Plainmeller got under way, with the Adirondack in tow, and arrived in New York on the eighth of October, about 3 o’clock in the afternoon, without any mishap, except the breaking of a wire hawser belonging to the Adirondack. After that broke the towing was done with a cove hawser furnished by the Plainmeller.
There was some evidence offered for the purpose of showing that the machinery of the Plainmeller was injured by the strain upon her occasioned by the towage, but I am unable to find that the slight repairs found necessary upon her arrival at New York are properly attributable to this cause. Prom *390 New York the Plainmeller, after putting her machinery in order, proceeded to Philadelphia, where she waited several days before her cargo was ready for her. The ordinary speed of the Plainmeller, as she was before taking the Adirondack in tow, was nine and a half knots. Her speed with the other vessel in tow was about seven knots.
Upon these facts I think there can be no question that the sum demanded by the captain of the Plainmeller and finally assented to by the captain of the Adirondack — £4,000—was very largely in excess of that liberal compensation which courts of admiralty award for similar services, and that the amount tendered, which is a little more than £1,500, is fully up to the measure of salvage award which any court of admiralty would give for the service rendered.
The Adirondack was in no present peril. She was temporarily disabled in her machinery, but unless overtaken by very tempestuous weather her machinery could have been soon repaired, so that she could proceed on her voyage. Her cargo was not perishable. There is no proof that the broken machinery endangered the safety of the ship. She was otherwise sound and able to keep the sea for an indefinite time. The place where she was was the open ocean, with no risk of going ashore. She had no passengers. The Plainmeller deviated very little from her voyage. She had neither cargo nor passengers. Although her compensation was contingent on her success there was little risk of failure to complete the service, as she was a powerful steamer, well able to tow the Adirondack. She incurred very little appreciable danger in rendering the service beyond that incident to every sea voyage. The necessary delay was not, under the circumstances in which she was placed, such as involved any special damage or inconvenience to her. In no one of the several elements which the courts of admiralty consider, in estimating the amount of salvage, was the case such as to require an extraordinary reward. See The City of Berlin, 37 L. T. 307; The Herman Ludwig, Vice Adm’y Ct. of Nova Scotia; Pacific M. S. S. Co. v. Ten Bales Gunny Bags, 3 Sawy. 187; The City of Richmond,, 25 Mitch. Mar. Reg. 271; The Yorkshire, Id. 114; *391 The Cleopatra, L. R. 3 P. Div. 145; The Colon, S. D. N. Y., unreported.
The eases cited by tbe libellant’s counsel do not conflict with these cases. Every case of salvage has its own peculiar circumstances, and where the amount awarded for a salvage towage service seems to be large, an examination of the special service will disclose a reason in some extraordinary feature of the ease — either the great peril from which the property saved was rescued, or its great amount, or the unusual risk run, or inconvenience and expense incurred, in rendering the service. The Paris, Spinks’ E. & O. Rep. 289; The Nimrod, 14 Jur. 944; The Hotspur, 15 Mitch. Mar. R. 1649; The Mo, 16 Mitch. Mar. R. 401; The Mary, Id. 1425; The African, 5 Mitch. M. R. 911; The Araxes, 7 Mitch. M. R. 585. See, also, The Seagull, 16 Mich. Mar. Reg. 1425; The Emily B. Souder, 7 Ben. 550; S. C. in Cir. Ct. not reported. It is true, as argued by the learned counsel for the libellant, that the recovery of any reward is contingent on success, and that the merit of the service ought not to be measured with reference to the apparent ease with which it was, in fact, rendered; that the undertaking was attended by all those possibilities of delay, danger, and final disaster from which service on the ocean is inseparable. But all these possibilities are taken into consideration by the courts in determining the amount of salvage compensation, and the rates of salvage are intended to be and must be assumed to be based upon a consideration of all the circumstances in which the two vessels are placed at the time the service is undertaken, including all these adverse possibilities.
In respect to the special contract for £4,000, in this case, it must be held that it was unjust and unreasonable in amount. While there is no charge of any fraudulent practice by which the agreement upon this sum was procured, there is evidence enough that the agreement was improvident, and entered into without much consideration of the proper elements of a salvage reward. The contract recites that the Adirondack was totally disabled as to her machinery. This was true as to her temporary disability, but misleading as a statement of absolute *392 disability. The captain of the Plainmeller insisted on his own terms, and made the agreement to them a condition of rendering any assistance. I think he took advantage of the situation of Captain Roberts to exact from his circumstances of present distress an exorbitant and grossly excessive amount. The master of the Adirondack was inexperienced. This was his first voyage as master. He knew little or nothing of machinery, and seems not entirely to have relied on what his engineer told him as to their ability to repair and go on under steam. His judgment was overborne, by the pressure of the circumstances in which he was placed, to that degree which fully justifies a court of admiralty in relieving owners of his ship from the inequitable bargain into which he improvidently entered.
It is not because the bargain proves to be a hard one that the courts of admiralty set aside such a stipulation. It is because it is obviously unjust, and the parties do not deal on equal terms. The apprehension expressed by the learned counsel for the libellant, that the setting aside of such contracts will tend to discourage the rendering of salvage services, is unfounded so long as the courts award, as they endeavor to do in every case, such as a sum as will be not only a quantum meruit for the time and labor employed in the service, but a reliable reward for the assistance rendered and the perils voluntarily incurred. If the amount agreed upon exceeds Bomewhat the accustomed measure of this liberal reward, it will not be disturbed, if deliberately and understandingly assented to, without the judgment of the promising party being overborne by the distress in which be is placed; but where the amount agreed upon is more than double, or, as in this case, nearly treble, that measure of liberal reward, the upholding of the contract would invite rapacity, and tend to prevent the rendering, upon just and proper terms, of salvage service under circumstances in which it is for the interests of commerce that it should be offered and not refused.
If it were understood that double salvage, if insisted on and agreed to, must be paid, except in case of actual fraud, some masters to whom assistance is offered would refuse to agree, *393 although they thereby would take risks that are improvident; and many by whom assistance is offered would succeed, by the persistency of their demands, in extorting from the fears or the necessities of the other party a reward to which they are not entitled. The Emulous, 1 Sumn. 209; The A. D. Patchin, 1 Blatch. 424; The Wexford, 6 Ben. 119; The Homely, 8 Ben. 495; The Jacob E. Ridgway, Id. 179; The Jeremiah, S. D. N. Y. March 3, 1879, unreported; The Helen and George, Swabey, 368. The claimants having tendered and paid into court the full amount to which the libellant is entitled, together with the costs of libellant up to the time of such payment, the libellant is entitled to a decree for that sum, and the claimants will recover their costs subsequent to that time, to be paid out of the same.
Decree accordingly.