## A LOT OF WHALEBONE.

### LEWIS *et al.* v. A LOT OF WHALEBONE.

*(District Court, N. D. California. August 30, 1892.)*

No. 10,269.

1. SALVAGE—WHAT CONSTITUTES SALVAGE SERVICE.
   A whaling vessel with a cargo of whalebone and oil went ashore in the Arctic sea. Her rudder and keel were broken, and her machinery displaced. Every effort to get her off was unavailing, and distress signals were displayed. A similar vessel was cruising in the vicinity, but the dangerous condition of the sea prevented any response. Next morning a message was sent by the captain of the wrecked ship, to wit, that if the captain of the salving ship would "set his colors to the mizzen peak he would leave his ship, and come aboard; or, if he thought that his bone could be saved, to send his boats for it." There was some conflict as to the purport of the message, but it was decided that the weight of testimony and the surrounding circumstances indicated that the captain of the wrecked vessel was anxious to escape with his crew, and the saving of the cargo was a secondary consideration. The whalebone was rescued, and landed safely in port. *Held*, the bone must be regarded as having been *quasi* derelict, and the service in securing it a salvage service.

2. SAME—PARTIES—DISMISSAL.
   When some of the owners of a salving ship are also part owners in the salved property, and their interests in the respective properties are varied and graded, and where it is necessary, in order to effect an equitable adjustment of the question of salvage, and avoid a multiplicity of suits, that all of the owners be made parties,

the question of salvage must be as between the salving ship as one party and the salved property as the other; and such owners are not entitled to be dismissed as colibelants on filing a petition therefor.

3. SAME—COMPENSATION.

The property saved from the wrecked ship was worth $25,797.25. The labor of 30 of the crew of the salving ship was required for several hours to transfer the bone. Great skill and energy were displayed and personal risks incurred in effecting the transfer, which was made in boats, through the ice. The salving ship, with her cargo, was worth $75,000, and was exposed to the same fate which overtook the wrecked vessel. She was engaged in whaling at the time, with a prospect of a further catch. The season was short, and time was valuable. *Held*, in view of these facts, that the libelants were entitled to one third of the value of the salved property, to wit, $8,599.08, the shipowners to receive $4,006.54, and the remainder to be distributed among the other libelants according to the services rendered, as ascertained by the articles of shipment.

4. SAME—WHO ARE SALVORS

The fact that a part owner in a salving ship also has an interest in the salved property will not prevent him from sharing in the salvage.

In Admiralty. Libel for salvage. Decree for libelants.

*Edward Gray Stetson*, for libelants.

*Andros & Frank* and *Page & Eells*, for claimants.

MORROW. District Judge. This is a suit brought by William Lewis, of New Bedford, Mass., managing owner, and Joseph Whitesides, master, of the steam whaler Belvidere, on behalf of themselves and of the other owners, and of the officers and crew of the vessel, and all others entitled to recover compensation for a salvage service in rescuing a lot of whalebone from the wreck of the steam whaler William Lewis, near Point Barrow, in the Arctic ocean, October, 1891.

On the morning of the 3d day of October, 1891, the steam whalers William Lewis and Belvidere were engaged in whaling in the Arctic ocean, about 25 miles northeast of Point Barrow. Both vessels were bark-rigged steam whalers. The Lewis was the more powerful vessel of the two. She was commanded by A. C. Sherman as master, and her crew of officers and men numbered 47. She had on board a lot of whalebone, subsequently valued at $25,797.25, and 250 barrels of oil, of the value of about $2,500. The Belvidere was commanded by Joseph Whitesides as master, and her crew of officers and men numbered 44. It is alleged in the libel that she was worth, with her catch, supplies, and equipments, in the neighborhood of $75,000, and this is not denied in the answer. About 7 o'clock on the morning of October 3d the wind commenced to blow from the northeast, and continued to increase during the day until about 4 o'clock in the afternoon, when the gale was accompanied by a heavy snowstorm. The Lewis and Belvidere sought shelter under the lee of Point Barrow, rounding that point between 7 and 8 o'clock in the evening. At the start from the whaling ground the Lewis was in the lead, but the Belvidere, steaming a little faster than the Lewis, obtained the lead, and kept it until the Belvidere came to an anchor in shoal water, south of the point. At this time it was snowing hard, and dark. The Belvidere dropped both anchors, and, in consequence of the shoal water, blew three blasts of her whistle, to notify the

Lewis that there was danger. The Lewis was about two points off the starboard quarter of the Belvidere. In a few minutes it was discovered that the Lewis was ashore. The Belvidere kept up steam all night, and steamed up to her anchors to relieve the strain on them. The vessel drew 16 feet of water, and it was found on sounding that she had but 3½ feet of water under her keel. When the Lewis ran ashore her engines were reversed, and sail made, to back her off. Every effort was made in this direction until about 11 P. M., the vessel pounding heavily all the time, when the propeller refused to revolve, and it was found that the rudder was broken in two pieces. The engineer reported the keel broken, and the machinery thrown out of position, and at about the same time water was discovered coming in on the starboard side. At midnight the Lewis blew her steam whistle several times, sent up rockets, and burned blue lights, to indicate her dangerous position and need of assistance. These signals were observed on board the Belvidere, and the captain of the latter vessel asked Mr. Blain, the second officer, if a boat could be got to the Lewis. The latter thought that the sea was too rugged, and that it would not be safe to make the effort. The wind and snow continued during the night. In the morning the captain again asked Blain about sending a boat to the Lewis, and was again told that it would not be safe. None of the officers of the Belvidere wanted to go. A heavy swell coming in made the situation dangerous for the Belvidere. Accordingly, about 6 o'clock, she steamed up to her anchors, took up one, slipped the other with 45 fathoms of chain, and moved off shore about half a mile, when she was again anchored, with the Lewis on her starboard beam. Masses of ice, coming in around the point and grounding outside, had made the water smoother inshore, but the heavy swell continued, and the strong current, carrying ice, and running southward, rendered it still dangerous to attempt to reach the Lewis. About 10 o'clock one of the Lewis' boats went inshore of the ice, and then, coming off to the windward of the Belvidere, came down with the current through the ice to that vessel. This boat had eight men in it, and was in charge of Smith, the boatheader of the Lewis.

So far there is a substantial agreement as to the material facts, but at this point there is a conflict in the testimony. Capt. Whitesides testifies that when Smith came on deck "I asked him if he came with a report from Capt. Sherman, and he told me that Capt. Sherman said if I would set my colors to the mizzen peak he would leave his ship, and come aboard, or, if I thought I could get his bone, to send my boats in. I thought I would try and send my boats in." Blain, the second officer of the Belvidere, testifies that Smith told him that he came to the Belvidere to get the captain to stop by him; that the ship was bilged, and couldn't be got off; that "he wanted the captain to take the crew, if he couldn't come there for the bone; if he could get the bone, he would like him to come there and get it; if he could not get it, he would like him to take the crew." Capt. Sherman of the Lewis testifies that he sent a boat to the Belvidere between 10 and 11 o'clock, in command of Boatheader Smith. "I told him to tell Capt. Whitesides to send his

boats in to get my bone, or help take it off. I do not remember saying anything about taking the crew off." On cross-examination, he was asked if he remembered the exact message he sent to Capt. Whitesides. He said he thought he did. "I sent for him to come, and send his boats in, and take my bone, or help take it." In reply to the question, "Did you say anything about setting colors?" he answered, "I don't think I did." Boatheader Smith was not produced as a witness, but it was explained that he departed for New Bedford before his testimony could be taken. The terms of the message sent by Capt. Sherman to Capt. Whitesides at this juncture are deemed significant as indicating the purpose of the former with respect to the cargo of bone on board the Lewis. In the event Capt. Whitesides had determined that he could not take off the bone, was it the intent of Capt. Sherman to abandon it, as he did the vessel, and the 250 barrels of oil left on board? The message, as testified to by Capt. Whitesides and Second Officer Blain, indicates that such was his purpose; but Capt. Sherman does not remember that he asked Capt. Whitesides to set his colors to the mizzen peak as a signal for the former to leave his ship and come on board the Belvidere, and he does not think he did; nor does he remember saying anything about taking off his crew. As indicating his purpose not to abandon the bone, he testifies that there would have been no difficulty in landing the bone, and carrying it, on sleds, to Cape Smythe, where a government station is located, and also a trading station; but he says the better way would have been to take it down in the boats. The Lewis had no sleds, but they could have made them. He thinks the bone could have been landed and taken to Cape Smythe by sleds in two days, or by boats in a few hours, and he thinks his men would have risked spending the winter up there in order to save the bone. Capt. Sherman is not confirmed, in this view of the situation, by a single witness, but, on the contrary, it appears that the only persons who had anything due to them from the voyage, over and above their indebtedness to the ship, as the result of the catch up to that date, were Sherman, the master, Greenwood, the second mate, Smith, the boatheader, and Bayman, fireman. The remaining 43 members of the crew had no interest in saving the cargo of the Lewis, and there is testimony tending to show that some of them made forcible declarations to that effect, using language that need not be repeated. But, further than this, the testimony of Capt. Sherman is lacking in candor. He says that the stations at Cape Smythe are between five and eight miles south of Point Barrow. This is not true. Capt. Knowles, one of the owners of the William Lewis, and manager of the Pacific Steam Whaling Company, testifies on behalf of the claimants that the company has a station at Cape Smythe, but he says it is about 15 miles from Point Barrow. He had never been there, however, and must therefore have based his testimony on official charts or common report. The coast and geodetic survey gives the distance between Point Barrow and Cape Smythe at 16½ miles. Capt. Sherman testifies that he has been eight seasons in the Arctic; has been to Cape Smythe, and a great many times each year to Point Barrow. His mistake in

the distance between these two points cannot therefore be attributed to ignorance. A competent sea captain ought certainly to be correctly informed as to distances on a familiar shore line by charts and observations, and his failure to state correctly a fact having relation to possible relief from a perilous situation must be considered as impairing the credibility of such a person as a witness. The weight of testimony and the surrounding circumstances indicate that Capt. Sherman was anxious to escape with his crew from the wreck of the Lewis with such personal effects as could be saved, and that the saving of any part of the cargo was a secondary consideration. The message sent by Capt. Sherman and received by Capt. Whitesides was therefore undoubtedly in the terms stated by the latter, or substantially so.

In response to this message, Capt. Whitesides called all hands, and sent his boats in, with directions to go with the ice until they got inshore, and then pull up to the wreck, where the current was not so strong. The boats were sent in about noon. The gale had moderated, but young ice was making. The boat that came out from the Lewis was returned, but manned by a crew from the Belvidere. Four other boats were sent from the Belvidere. There were six men in each boat, making 30 in all. They were instructed to do what they could to save the bone, and to say to Capt. Sherman that Capt. Whitesides would stay as long as possible, and when he got ready to go he would set his colors to the mizzen peak. When the boats reached the Lewis, the bone was on deck. The boats were loaded, and they started back, but were carried by the current to leeward, whereupon the Belvidere took up her anchor, and went in about half way to the wreck, and picked up the boats. The water was about 3½ fathoms. As the boats had not brought off all the bone, they were sent back. Capt. Whitesides also went on board the Lewis, but remained but a few minutes, not deeming it safe to be away from his own vessel. Upon returning to the Belvidere he took up her anchor, and again moved further to leeward. He also sent one of the boats still further to leeward, with a line from the ship, to pick up some of the boats that had got adrift. About 5 o'clock the last of the boats had returned to the Belvidere, and all the bone had been placed on board that vessel. It was impossible to save the oil, and it was left in the wreck. The officers and crew of the Lewis came in their own boats to the Belvidere, bringing with them their personal effects. They took no part in the transfer of the bone beyond bringing it up on the deck of the Lewis. There is some testimony to the effect that one or two of the crew of the boat sent from the Lewis to the Belvidere returned to the Lewis, but, if so, it was to secure some personal effects, and not to assist in transferring the bone. It also appears that one or two native boats carried a small quantity of bone, but, on account of the danger of being crushed by the ice alongside of the ship, the bone was transferred to one of the ship's boats before being placed on board the vessel. When all were aboard the Belvidere, she took up her anchor at once, and steamed to the south and west; the wind blowing fresh, and the current running strong to the southward. In passing through the floating and grounded

ice navigation was difficult and dangerous. The vessel struck once, and one of the bobstays was carried away, but by skillful management she was brought safely out of her dangerous position, and on the following day she was steered to the northward, to make a lee under the ice. Her course was then directed along the ice pack to the westward until about the 9th or 10th of October, when she fell in with other vessels of the whaling fleet, and distributed 31 of the crew of the Lewis among the vessels, retaining 16 on board the Belvidere. On the 16th of October the Belvidere left the Arctic for San Francisco, where she arrived November 5, 1891. In coming down, the bone on board the Belvidere, including that taken from the wreck of the Lewis, was washed and scraped by the crews of both vessels. This work took about two days. After the arrival of the vessel here the bone was bundled and packed at an expense of $50 to the salvors. As before stated, the bone taken from the Lewis is valued at $25,797.25, and the question is, did the officers and crew of the Belvidere render a salvage service in rescuing this bone from the wreck, and bringing it safely to the port of San Francisco? Capt. Sherman testifies that he did not think he was paying salvage for the service, and gives as a reason that the owners of the Lewis and Belvidere were the same; and he did not think there would be any salvage any way. He qualifies this statement, however, by saying that several of the owners are the same. In the protest dated November 7, 1891, and signed by A. C. Sherman, master, W. J. Greenwood, mate, James F. Ferndon, carpenter, and Henry Pratt, chief engineer, it is declared that "Oct. 4th, about noon, a boat was sent to the Belvidere for assistance. Her boats were sent back, and at 3 P. M., the wind having moderated, the master and crew left the vessel, saving but a portion of their personal effects. At that time the vessel had settled in the sand on her starboard side." Nothing is said in this protest about the cargo of the Lewis. As far as this document furnishes evidence, the vessel and cargo were abandoned by the master and crew, and nothing saved by them but a portion of their personal effects. In the log book of the Lewis the following entry was made in relation to the events attending the disaster:

"STR. WILLIAM LEWIS, Sunday, October 4th, 1891.

"In command, Captain A. C. Sherman. While coming in last night for shelter, winds blowing a gale from the N. E., and thick snowing, in company with the Belvidere, under steam, the sails clewed up, we got into four fathoms of water, and $\frac{1}{4}$ less 4, land was reported on the lee bow or starboard bow. Captain Sherman ordered the helm hard a-starboard, when she struck bottom. Time about 7 P. M. of the 3d. All sails and steam was used in trying to get her off; the ship drawing about $14\frac{1}{2}$ forward, and $15\frac{1}{2}$ feet aft; water 12 foot forward, 15 waist, 18 aft. The ship seemed to be working on at 11 P. M. night of the 3d. The rudder was broken in two pieces. Took in all sail and stopped steaming; the propeller striking something hard, the ship pounding very hard. At daylight morning of the 4th we saw our position. We had struck bottom about one mile southwest of the point. The ice had come in and grounded around us. The rudder was in two pieces. The stern post looked as if gone. The water has come into the ship up to the ash pans, about 5 foot. Winds had moderated. At 3.30 P. M. Captain Sher-

man abandoned the William Lewis about one mile S. W. of Point Barrow. Went on board of the Belvidere."

Point Barrow is in 71° of north latitude. The region is barren, exposed, and desolate. At the time of the wreck of the Lewis a storm was raging of such fury as to cause vessels to seek shelter. It was late in the season, and, under the circumstances, the coast was dangerous. It is true that at Cape Smythe, 16½ miles south of Point Barrow, there are two refuge stations,—one established by the government, and the other by the Pacific Steam Whaling Company; but whether they were sufficiently equipped in October of last year to furnish food and shelter to 47 additional men during the long winter does not appear. The most that can be said is that they were established for the purpose of affording temporary relief to vessels in distress, and, presumably, they were so maintained; but from what has been stated, and the fact that the coast is otherwise uninhabited by white people, it is evident that the presence of the Belvidere at the scene of the disaster to the Lewis was a fortunate circumstance, and that the conduct of the officers and men of the former vessel was highly meritorious. In view of all the facts in the case, the bone rescued from the wreck must be treated as having been *quasi* derelict, and the service rendered by the Belvidere a salvage service.

We now come to the question of the ownership of the Belvidere and William Lewis, and the cargo of the latter. J. N. Knowles, A. C. Sherman, Samuel Foster, and Roth, Blum & Co. have filed a petition representing that they are co-owners with the other parties mentioned in the libel of the lot of whalebone proceeded against in this suit, and that they are also part and co-owners with the other parties mentioned in the libel of the steam whaler Belvidere; that they have, without their consent, been made colibelants; that they never did, and do not now, desire to be parties to the libel; that they desire to withdraw therefrom; wherefore they petition the court to order that the libel, so far as they are concerned as libelants, be dismissed. It appears from the stipulation on file that the petitioners are part and co-owners of the Belvidere in the following interests:

| | | | | | |
|---|---|---|---|---|---|
| J. N. Knowles, | - | - | - | - | - 12/96 |
| Samuel Foster, - | - | - | - | - | 6/96 |
| A. C. Sherman, | - | - | - | - | - 6/96 |
| | | | | | |
| Total, - | - | - | - | - | - 24/96, or ¼ |

In the petition, Roth, Blum & Co. are represented as co-owners in the vessel to the extent of 6/96, but they do not appear so in the stipulation. The name of Leon Blum does, however, appear in the last-named document as owning 6/96 of the Belvidere, and Roth, Blum & Co. 6/96 of the William Lewis. It also appears from the same stipulation that these parties are also part owners of the William Lewis and her cargo of whalebone in the following interests:

| | | | | | | |
|---|---|---|---|---|---|---|
| J. N. Knowles, | - | - | - | - | - | 30/96 |
| Samuel Foster, | - | - | - | - | - | 6/96 |
| A. C. Sherman, | - | - | - | - | - | 12/96 |
| | | | | | | ———— |
| Total, - | - | - | • | - | - | 48/96, or ½ |

It will be observed that Knowles and Sherman have greater interests in the whalebone than they have in the salving steamer, and hence it would be to their advantage to withdraw their interests from these proceedings. Samuel Foster has the same interests in the salving steamer that he has in the whalebone, and would naturally be willing to balance the account in his own way. And, assuming that Roth, Blum & Co. and Leon Blum are one and the same parties, we find that their interests in the salving steamer and the whalebone are the same, and, like Mr. Foster, they would probably be willing to balance their own account.

We have here, then, an ownership representing 30/96 of the salving steamer and 54/96 of the salved property asking to have the libel dismissed so far as these interests are involved in this controversy. The application appears to have merit, but let us inquire as to what effect such a dismissal would have upon the remaining interests. Would it be fair, under all the circumstances, to send some of these owners out of court, and impose the burden of the proceedings upon those who remain? Manifestly all interests should be treated alike.

The following persons were also owners of interests in the Belvidere, and in the William Lewis and her cargo of whalebone, as follows:

| | | In William Lewis and | |
|---|---|---|---|
| S. C. Hart, in Belvidere, - | 3/96 | her cargo of bone, | 3/96 |
| A. Anderson, " - - | 3/96 | " " " " " | 2/96 |
| William Lewis, " - | 15/96 | " " " " " | 6/96 |
| Geo. S. Horner, " - - | 6/96 | " " " " " | 3/96 |
| A. Coddington, Jr., " - | 6/96 | " " " " " | 3/96 |
| | ———— | | ———— |
| Total, - - | 33/96 | - - | 17/96 |

These parties do not ask that the libel be dismissed, as far as they are concerned.

The following persons were owners of interests in the William Lewis and her cargo of whalebone, but were not owners in the Belvidere:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| E. H. Hanson, | - | - | - | - | - | - | 7/96 |
| Jos. Laflin, | - | - | - | - | - | - | 3/96 |
| Benj. H. Waite, | - | - | - | - | - | - | 3/96 |
| Nathan Adams, | - | - | - | - | - | - | 3/96 |
| H. Liebes & Co., | - | - | - | - | - | - | 6/96 |
| L. & F. R. Brightman, | - | - | - | - | - | - | 3/96 |
| | | | | | | | ———— |
| Total, - | • | • | - | - | - | - | 25/96 |

The following persons were owners of interests in the Belvidere, but not in the William Lewis or her cargo of whalebone:

| | | | | | | |
|---|---|---|---|---|---|---|
| A. H. Seabury Estate, | - | - | - | - | | 12/96 |
| J. Gammons, Jr., | - | - | - | - | - | 3/96 |
| William Baylies, | - | - | - | - | - | 3/96 |
| J. G. Willard, | - | - | - | - | - | 3/96 |
| G. F. Bartlett, | - | - | - | - | - | 6/96 |
| Abby Avery, | - | - | - | - | - | 3/96 |
| A. F. Church Estate & C. C. Church, | | | - | - | | 3/96 |
| | | | | | | |
| Total, | - | - | - | - | - | 33/96 |

It is plain, from the foregoing statement of the various interests involved in this controversy, that the libel cannot be dismissed as to the petitioners J. N. Knowles, A. C. Sherman, Samuel Foster, and Roth, Blum & Co. without doing injustice to others who, like themselves, are interested in both vessels, and that the only way to proceed with due regard to all the interests concerned is to determine the question of salvage as between the salving ship as one party and the salved property as the other. In this way an equitable adjustment may be made, not only in the contribution to and distribution of salvage, but also in the costs of the proceedings.

But it is contended that the shipowners cannot be salvors of their own property, and the case of The Caroline, 1 Asp. 145, is cited as an authority to that effect; but the question involved in that case was as to the sufficiency of a tender wherein parties paying for a salvage service made a tender of £200, pleading that a part owner of the salved vessel owned more than half of the steam tug that performed the salvage service. Dr. LUSHINGTON, considering that this interest in the vessel and tug had been deducted, sustained the tender. The case does not meet the question under consideration.

But the law is well established by authority that the master and crew of one vessel may recover for a salvage service rendered another vessel belonging to the same owners. The Colima, 5 Sawy. 181; The Sappho, L. R. 3 Adm. & Ecc. 142; The Glenfruin, 10 Prob. Div. 103; The Cargo ex Laertes, 12 Prob. Div. 187. It is also the law that the owners of a salving ship, who are also the owners of the salved ship, may obtain salvage remuneration from the owners of the salved cargo, provided the circumstances which cause the necessity for the salvage services do not amount to a breach of the contract of carriage between the shipowners and the owners of the cargo which is on board the salved ship. P. M. S. Co. v. Ten Bales Gunny Bags, 3 Sawy. 187; The Miranda, 4 Marit. Law Cas. 440; The Cargo ex Laertes, 12 Prob. Div. 187. In these last cases it may be assumed that the owners of the salving ship had no interest in the cargo except as owners of the freight; but, as freight may be required to contribute to salvage, it is clear that the authorities do not go to the extent of eliminating from a salvage service the interests of all persons who may also have some interest in the salved

property. In this respect the rules of admiralty are not governed by the strict rules of the common law, but act upon enlarged principles of equity. *The Virgin*, 8 Pet. 540; *Richmond* v. *Copper Co.*, 2 Low. 315. "It is the duty of salvors, in bringing suit for salvage compensation, to make all the cosalvors parties. This they are required to do, at least in general terms, to enable the court in one final decree to do full justice to all concerned. Another and most important reason for the strict enforcement of this rule is to be found in the necessity of avoiding a multiplicity of suits." *The Edward Howard*, 1 Newb. Adm. 523. In the case at bar, the master and crew of the Belvidere are unquestionably entitled to recover compensation for the salvage service rendered by them in rescuing the cargo of bone from the wreck of the Lewis, and, under the authorities cited, I am of the opinion that the owners of the Belvidere are also entitled in this action to recover compensation for the services of the ship.

The next question is as to the amount of the salvage award. It will not be necessary to review the numerous authorities on this subject. It is sufficient to say that, while they do not fix any certain standard of compensation, they point out the elements to be considered in determining the amount of the reward to be decreed for the service: (1) The labor expended by the salvors in rendering the salvage service; (2) the promptitude, skill, and energy displayed in rendering the service and saving the property; (3) the value of the property employed by the salvors in rendering the service, and the danger to which the property was exposed; (4) the risk incurred by the salvors in securing the property from the impending peril; (5) the value of the property saved; (6) the degree of danger from which the property was rescued. *The Blackwall*, 10 Wall. 13, 14. The principal incidents connected with this service have been related. It appears that for several hours the labor of some 30 men was expended in taking boats through the ice to and from the wreck, while 14 more were employed in handling and looking after the safety of the Belvidere. The salvors were reasonably prompt in rendering the service. It is true that they waited until the gale had moderated on the morning of October 4th, but this delay appears to have been the result of good judgment, rather than a lack of interest in the situation. The evidence is to the effect that boats would have been sent before, had there been any prospect of reaching the Lewis. The difficulties they encountered when they did go indicate that an earlier effort would have been futile. Skill and energy were displayed, not only in handling the boats engaged in transferring the bone, but also in the movements of the ship in avoiding dangers, and in picking up the boats on their return. The value of the Belvidere, with her supplies, equipments, cargo of bone and oil, was $75,000. All the property was exposed to the same fate that overtook the Lewis. The Belvidere was surrounded by masses of grounded and floating ice, in the midst of a strong current, with shoal water under her keel. The business of whaling, in which she was engaged, would, under ordinary circumstances, have called her away from this shore early on the morning of October 4th,

and her perilous position was a still further reason for her immediate departure. Had her officers looked only to their own welfare and safety or that of the ship, they would have continued her first move in the morning out into deep water, and probably on the course she subsequently took; but she dropped anchor, and remained during the day for the purpose of extending relief to the Lewis. There was some personal risk incurred by the salvors in securing the bone from the wreck. The boats returning found some difficulty in reaching the ship, and some of them were picked up; but, taking the venture as a whole, there was no great risk, and this fact will be taken into consideration. The degree of danger from which the property was rescued has been discussed. It appears that the bone was not wholly derelict, and that fact will also be considered. But there is another element involved in this service that may be mentioned. The Belvidere was engaged in whaling, with a prospect of further catch. The season is short in the Arctic, and every day is of value in such a voyage. An average whale is worth from $10,000 to $12,000. After the Belvidere took on board the crew of the Lewis, no more whales were taken. The result of a loss of time to a steam whaler of the capacity of the Belvidere is, of course, uncertain, but it must be remembered that such vessels are capable of rendering valuable services, in case of disaster to other ships, in saving life and property, and the policy is to encourage the best efforts and the fullest sacrifice in that direction. It appears proper, therefore, under the circumstances, to give some consideration to the loss of time incurred by the Belvidere, and also her effectiveness in rendering the salvage service.

In view of all the facts in the case, I will direct that a decree be entered in favor of the libelants for one third of the value of the property saved. This will amount to $8,599.08, and in making the distribution of this award among the salvors I will follow the shipping articles in determining the value of the services rendered. All but three of the officers and men shipped for the voyage on lays or shares; the master receiving 1/14; the mate, 1/23; and the other officers and men receiving different shares, according to their services and skill, down to the ordinary seaman, who received 1/180. The three exceptions were the engineer, whose wages are not shown by the original articles; the assistant engineer, who was to receive $95 per month; and one of the boatsteerers, who was to receive $125 per month. Assimilating these three services to others of like character, as shown by the shipping articles, I find that the engineer would be entitled to receive 1/80, the assistant engineer 1/100, and the boat steerer 1/80. The aggregate of all these lays or shares would then be 53.40 per cent. of the proceeds of the voyage, leaving 46.60 for the ship. There are cases indicating that a reasonable allowance for a ship in a salvage service is one third of the value of the property recovered, but I find sufficient reason for departing from such an allowance in the character of the service rendered by the ship in this case, and in the mutual agreement between the officers and men and the owners of the vessel as to the individual share each should have in the proceeds of the voyage, and in the relation of the aggregate of

such shares to the interest retained by the ship. It seems to me, therefore, that it would be fair and reasonable to treat the salvage award as though it were a part of the legitimate proceeds of the voyage, and distribute it accordingly. The decree will therefore provide for a distribution of the salvage on that basis, as follows:

| | | | | |
|---|---|---|---|---|
| To the captain, having 1 1/14 lay, (1) | - | - | $614 22 | |
| To those having 1 1/23 lay, (3) | - | | 373 42 | each |
| "   "   "   1 1/55 lay, (2) | - | - | 156 35 | " |
| "   "   "   1 1/80 lay, (6) | - | | 107 49 | " |
| "   "   "   1 1/85 lay, (1) | - | - | 101 18 | |
| "   "   "   1 1/90 lay, (2) | - | | 95 55 | each |
| "   "   "   1 1/100 lay, (3) | - | - | 85 99 | " |
| "   "   "   1 1/110 lay, (1) | - | | 78 90 | |
| "   "   "   1 1/120 lay, (1) | - | - | 71 60 | |
| "   "   "   1 1/170 lay, (2) | - | | 50 58 | each |
| "   "   "   1 1/180 lay, (23) | - | - | 47 77 | " |

| | |
|---|---|
| To officers and crew, - - | $4,592 54 |
| To owners of ship, - | 4,006 54 |
| Total amount awarded, - | $8,599 08 |

Let a decree be entered in accordance with this opinion.