GILCHRIST TRANSP. CO. v. 110,000 BUSHELS OF NO. 1 NORTHERN WHEAT.

(District Court, W. D. New York. February 6, 1903.)

1. SALVAGE—VESSELS OF COMMON OWNERS—RIGHT TO COMPENSATION FROM CARGO.

The fact that the owners of a salving ship were also owners of the ship salved does not preclude them from recovering salvage compensation from the cargo saved, where the peril which rendered the service necessary did not arise through any breach of the contract of carriage.

2. SAME—SERVICES RENDERED TO TOW.

An arrangement by one vessel to tow another belonging to the same owners, which had become disabled, did not include an agreement to render salvage services to the cargo of the tow, by extinguishing a fire which occurred without fault of either vessel, so as to preclude a recovery for such services.

3. SAME—SERVICES IN EXTINGUISHING FIRE—AMOUNT OF AWARD.

The steamer City of Genoa, while proceeding from Duluth to Buffalo, laden with wheat, became disabled, and was overtaken and taken in tow by the Mecosta, belonging to the same owners and bound for the same port. While in Lake Erie the City of Genoa caught fire forward, without fault on her part, and in response to her signal for assistance the Mecosta made fast to her, and for seven hours the crews of the two vessels fought the fire, until it was under control. The work was skillfully done, and the fire confined to the forward part of the vessel, which was held before the wind by the Mecosta, and the cargo was not damaged, except to some small extent by smoke and water. The Mecosta was in some peril; her bulwarks being scorched, and the lines by which she was made fast being burned. The fire was in the night, but the weather was calm, with little wind. The Mecosta was worth $70,000; the Genoa, after the fire, $60,000; and her cargo, $79.000. *Held*, that the Mecosta was entitled to salvage compensation from the cargo to the amount of $3,800, being about 5 per cent. of its value; $1,500 of the amount to be distributed among the crew.

In Admiralty. Suit to recover for salvage services.

Potter & Wright (George Starr Potter, of counsel), for libelant.
Harvey L. Brown (John C. Shaw, of counsel), for respondents.

HAZEL, District Judge. The libel in this cause was filed against the cargo of the City of Genoa to recover $7,500 for salvage compensation. The alleged services were rendered by the libelant's steamer Mecosta and crew in extinguishing a fire on the steamer City of Genoa on the 30th day of September, 1901. The disaster occurred about 30 miles west of Long Point, on Lake Erie, and continued from 8 o'clock in the evening to 3 o'clock the next morning. The facts as disclosed by the hearing are not denied. No testimony was given by respondents. The City of Genoa and the salvor, the Mecosta, were owned in common by the libelant corporation. The length of the Mecosta is 281 keel, 40 beam, and at the time of the fire she carried 100,000 bushels of wheat—her full capacity. Both vessels were built of wood, and, heavily laden with grain, were bound down on a voyage from the port of Duluth to the port of Buffalo. The Genoa left Duluth September 25, 1901. Her cargo, which has been libeled, consisted of 110,000 bushels of No. 1 Northern wheat, under bill of lading. On Lake Huron, about 5 miles from St. Clair river, her machinery

became disabled, and she was taken in tow by the Mecosta, assisted by a steam tug through the rivers and channels. The tug left the tow on reaching Lake Erie. No claim is made for towage services. The fire started on the main deck in the forward chain locker of the City of Genoa. She immediately signaled to the Mecosta ahead for assistance, and then cut the tow line. The Mecosta immediately rounded to. Her fire apparatus was placed in readiness, and she made fast to the Genoa's port side. The Mecosta's stern during the progress of the fire was abreast of the Genoa's texas deck house. While in this position, hazardous to her own safety, the Mecosta and 10 or 12 of her crew, out of a complement of 17—all who could be spared from the actual navigation of the vessel—energetically and successfully aided in allaying the progress of the flames. The fire, which had gained considerable headway when the Mecosta came alongside, was finally extinguished, owing to great exertions by the crews of both steamers. By their efforts and the vigilance of the Mecosta, the fire was confined to the main deck forward, and did not reach the cargo. Two lines of two-inch hose and a large number of fire buckets were used by the salving crew, who boarded the imperiled ship to subdue the flames. The lines of hose were handled interchangeably by the crews of the two vessels. In addition to the services mentioned, the Mecosta kept under way, and held the stern of the Genoa to windward. The spreading of the flames aft was thereby practically prevented, and the fire confined to the forward portion of the ship. The wind from the south was light, and at the rate of 5 miles per hour. The weather was calm. Witnesses for libelant testify that the heat was intense, and the Mecosta was in a perilous position. The master of the Genoa testifies that the crew of the Mecosta fought the fire valiantly, and that, if the Mecosta had not kept the Genoa before the wind, the fire could not have been confined forward. The Mecosta's bulwarks were scorched. Lines which held her to the Genoa were burned. On account of the heat, her master experienced difficulty in remaining on the pilot house. In extinguishing the fire, there was no serious risk or injury to the life or limb of any of the salvors. The Genoa's cargo sustained damage from water and smoke amounting to $3,627.11. Her pilot house was destroyed, and the forecastle and main decks burned away, causing her steering machine and windlass to fall to the deck below. The fire was at its height at about 10 o'clock at night, and under absolute control at 3 o'clock in the morning. No presumption of negligence is attributable to the City of Genoa. Her master and crew rendered efficient service in attempting to check the progress of the fire. Fortunately, 130 gallons of water in a tank on board the City of Genoa facilitated in arresting the fire's advance. Indeed, as I understand the argument, it is not claimed that the ship was at fault. It is claimed that signals of distress were sounded to passing vessels during the night, but none offered assistance. At about 5 o'clock in the early morning of the 30th, the passing steamer Uganda came alongside, and was requested to aid the salvor in towing the City of Genoa. She did so, leaving the City of Genoa, however, in the exclusive care of the Mecosta about 20 miles west of Buffalo. The Mecosta then towed her into port. The proofs sufficiently disclose that

the services rendered by the Mecosta and crew were meritorious, and went far to prevent the fire from reaching the City of Genoa's cargo, which was of the stipulated value of $79,300. The value of the City of Genoa immediately after the fire was stipulated at $60,000, and the Mecosta at $70,000.

It is contended by counsel for respondents that the general rule of awarding salvage compensation to a ship giving succor to another overtaken by unforeseen accidents or perils of the sea does not apply where both belong to the same owner, or where the salved ship was in tow of the salvor, and where, as here, both crews were under contract of employment with a common owner. This contention is based upon the theory that both ships were financially interested in safely transporting the cargo which each carried, and that the crew of the salvor owed a duty to their employer to save his property, though it be another vessel, whenever endangered by the casualties of the sea, and that the saving of the cargo was an incident to the performance of such duty for which no compensation as salvage should be allowed. This contention is not strictly maintainable. It is well established by authority that, where salvage services are performed by one vessel to another, both vessels belonging to the same owner, the crew of the salvor are entitled to recover salvage remuneration. The reason for the rule is founded upon the contract of employment. Salvage services rendered by the crew in aid of a disabled ship have never been regarded as within the scope of their employment. Such services entitle the crew to additional compensation, based on merit, hazard, and risk, and it is immaterial whether the salved and salving ships belong in common to the same owner. In A Lot of Whalebone (D. C.) 51 Fed. 916; The Colima, 5 Sawy. 181, Fed. Cas. No. 2,996; The Sappho, L. R. 3 P. C. 690. The mere fact of employment by an owner of more than one vessel does not carry with it an obligation to perform any other or different services than those called for by his shipping articles. The meritorious labor performed by the seamen of the Mecosta in saving the City of Genoa and her cargo was for the benefit of the owner of the ship and the cargo owners. In The Sappho, supra, it was decided that where one ship performed salvage services for another, both ships belonging to the same owner, the crew of the ship rendering the salvage services were entitled to recover salvage remuneration. Lord Justice Mellish, in announcing the decision of the court, said that the rule governing salvage services performed by the crew was based, first, upon whether the services rendered are in themselves such as would entitle them to remuneration on a basis of increased compensation for the hazardous undertaking; and, second, are such services within the scope of the contract of employment? In Pacific Mail S. S. Co. v. Ten Bales of Gunny Bags, Fed. Cas. No. 10,648, the precise question here involved was considered by the court. The salving and salved vessels belonged to the same owner, a corporation, which libeled a portion of the cargo and the steamship Colima for salvage. The circumstances, briefly stated, were that the Colima was disabled by reason of the loss of three blades of her propeller, which rendered her unseaworthy. She anchored and dispatched a boat in search of assistance, which, after several days, fell in with the steamship

Arizona.   The Arizona proceeded to the assistance of the Colima, and towed her to port.   It was held that the services rendered by the Arizona were in the nature of salvage services, and were to be compensated as if rendered by a stranger vessel.   In A Lot of Whalebone, supra, after an exhaustive review of the authorities, it was declared to be the law "that the owners of a salving ship, who are also the owners of the salved ship, may obtain salvage remuneration from the owners of the salved cargo, provided the circumstances which cause the necessity for the salvage services do not amount to a breach of the contract of carriage between the shipowners and the owners of the cargo which is on board the salved ship."   In the case at bar the salvage services were not required by a breach of contract of carriage on the part of the City of Genoa.   As we have seen, the proofs in the case disclose the performance of valuable services by the Mecosta and crew in extinguishing the fire on the City of Genoa.   Such services were accompanied by some risk to the safety of the Mecosta.   True, the fact that the Mecosta had entered into an arrangement to tow the City of Genoa to Buffalo, as well as the common ownership of both vessels, may properly be considered in awarding salvage compensation. The prior arrangement made to tow the City of Genoa to Buffalo cannot be construed to include the rendering of any salvage services to the cargo by extinguishing fires, or of rescuing the City of Genoa from unforeseen and extraordinary perils.   Such was the holding in The Connemara, 108 U. S. 357, 2 Sup. Ct. 754, 27 L. Ed. 751.   Considering the law applicable to this case well settled as herein announced, I have no hesitation in deciding that salvage remuneration, as distinguished from a quantum meruit, was earned by the Mecosta and crew for the services performed on the night of September 30, 1901, and set out in the libel.

The next question to be decided is the rate of salvage to be awarded, in view of the circumstances of this case.   I have no doubt that the compensation allowed should be on a basis of percentage of the value of the cargo salved.   The services performed were salvage services, pure and simple.   The rule in such cases, although the amount allowed is largely in the discretion of the court, is founded upon the nature and extent of the services rendered, and upon the circumstances surrounding the performance of such salvage services.   In The Sandringham (D. C.) 10 Fed. 573, the elements which enter into the allowance of an award are concisely stated as follows:

"(1) The degree of danger from which the lives or property are rescued. (2) The value of the property saved.   (3) The risk incurred by the salvors. (4) The value of the property employed by the salvors in the wrecking enterprise, and the danger to which it was exposed.   (5) The skill shown in rendering the service.   (6) The time and labor occupied."

"Salvage" is defined in Sonderburg v. Ocean Towboat Co., Fed. Cas. No. 13,175, to be "a reward for meritorious services in saving property on navigable waters, in peril, and which might otherwise be destroyed, and is allowed as an encouragement to all persons engaged in business at sea or on navigable waters, and others, to bestow their utmost endeavors to save vessels and cargoes which are in imminent peril."

The libelant, by its libel, asks for an award of 10 per centum of the value of the cargo of the City of Genoa. Such an allowance would seem excessive under the facts of the case. The fact that the Mecosta was towing the City of Genoa must be considered in arriving at a just and proper award. The circumstances here are not analogous to a case where a vessel voluntarily or pursuant to solicitation goes out of her course to render a service to a disabled ship. Both vessels were bound down for the port of Buffalo. The fire does not appear to have greatly delayed the arrival of the Mecosta at her point of destination. She was delayed about nine hours. Inasmuch as both vessels were owned and controlled by the libelant, it can hardly be reasonably contended that the remuneration should be as large as for the services of a stranger. The night of the fire was not tempestuous. It was a still night, with scarcely a ripple on the water. The salving crew diligently performed services which checked the progress of the fire. In this, however, they were assisted by the full complement of the Genoa's crew—about 16 in number—who cannot recover salvage compensation for services rendered in the saving of their own ship. The elements were favorable to a successful outcome of the faithful, though not hazardous, services performed.

My conclusion is that a decree should be entered in favor of the libelant for $3,800, which is approximately on a basis of 5 per centum of the value of the salved cargo. In making a distribution of this award among the salvors, I deem it equitable that the Gilchrist Transportation Company, owner of the Mecosta, should have and receive the sum of $2,300. The balance of the award, $1,500, will be divided among the crew in the following proportions. The total allowance to master and crew will be divided into twenty-five parts as follows:

Master, four parts ................................................. $240
Two mates, two and one-half parts (each)........................... 300
Two engineers, two parts (each).................................... 240
Twelve crew at $60 each............................................ 720

The names of the crew do not appear of record. Unless these may be inserted in the decree by agreement, the amount of the award to them may be paid into court, and proof taken as to their identity before distribution. The Flottbek (C. C. A.) 118 Fed. 954.

Let a decree in favor of the libelant, with costs, be entered accordingly.