## The Ella.

### Frame *v.* The Ella.

#### (*District Court, E. D. Virginia.* March 29, 1880.)

1. MARITIME CONTRACT—WHAT CONSTITUTES—LAUNCHING STRANDED VESSEL.

   A contract for launching a vessel, where the vessel has been carried a quarter of a mile up the beach by a storm, is a maritime contract, for which the vessel is liable *in rem*.

2. CONTRACTS—DELAY IN PERFORMING—WHEN UNREASONABLE.

   A schooner of 160 tons having been carried about a quarter of a mile up the beach by a storm, the master, on September 1st, contracted with a landsman experienced in moving houses to launch her for $1,000, to be paid when the launching was completed, and not before. The contractor promptly began work, but in several weeks had only moved her about twice her length. He then abandoned this plan, and hired a dredge to dig a canal up to her, which worked at intervals for some time, and then quit. On December 5th the dredge was again hired, and by December 22d had finished the canal up to the schooner's stern. After an unsuccessful effort at launching, nothing more was done until January 4th, when the master notified the contractor that, unless the work was completed in one week, he would terminate the contract. On the expiration thereof, notice was given that other persons had been engaged to finish the job. With the new employes the master succeeded in launching the schooner by March 9th. *Held* that, in view of the time consumed by the latter, the delay of the original contractor was not unreasonable, and he was entitled to recover the reasonable value of his services.

3. SAME—FALSE REPRESENTATIONS.

   The fact that the contractor agreed to "launch the schooner," and to "furnish all materials, labor, and implements necessary to launch" her, did not imply that he

was an experienced wrecker, or that he possessed the machinery, dredges, etc. that might be found necessary.

4. CONTRACT FOR SALVAGE—LIBEL IN REM.

An express contract for salvage services does not bar a libel *in rem* for compensation.

In Admiralty. Libel by John Frame against the schooner Ella for services performed under a contract to launch her, after being beached by a storm. Decree for libelant.

*W. G. Elliott*, for libelant.

*Ellis & Thom*, for respondent.

HUGHES, J. By the extraordinary storm of August, 1879, the schooner Ella, of Newcastle, Me., was carried 1,200 to 1,300 feet beyond the ordinary water's edge, and beached high and dry on the shore of the Elizabeth river, near Norfolk, far beyond the reach of the tides. The owner's agent rejected the offers of the Bakers, of this city, experienced wreckers, to launch the vessel for $1,200; and contracted at $1,000 with a landsman, John Frame, the libelant in this suit, who had had some experience in moving houses. There was a written contract, at the price named, dated on the 1st of September, 1879, in which the libelant stipulated to "launch the schooner," and "to furnish all material, labor, and implements necessary to launch" her, and that the work of "launching" should be commenced as soon as practicable, and without unnecessary delay. The agent contracted to pay for this service $1,000 as soon as the vessel should be placed in deep water; and that he should not be liable to pay any portion of the sum until the schooner was placed in deep water. No time was agreed upon for executing the work; the libelant stating in evidence that he was unwilling to bind himself to any limited time. The work was promptly begun about the 3d September, and the vessel was moved in a few weeks about the distance of twice her own length; she being a schooner of 160 tons. Then the plan of moving her over the ground seems to have been abandoned. It was determined, instead, to dredge a canal from the channel up to the place where the vessel then lay. For this purpose the dredge of one H. E. Culpepper was engaged, which went to work at $50 a day, and worked on at intervals until she had earned $351. A good deal of delay seems to have been caused by the necessity of waiting for this dredge. On the 5th of December the dredge was again hired; Frame and Condon, the master of the Ella, uniting with Culpepper in a written contract, by which they pledged the lien of the vessel for the $351 already earned, and for the wages to be earned. Under this arrangement the dredge again went to work, and by the 22d of December had run the canal up to the stern of the schooner where she then lay, and then knocked off from work, though it seems that a canal was dredged further on along one side of the schooner at some time or other. Attempts were made to slide the vessel sideways into this lateral canal, but they did not succeed. Then it was attempted to drag the vessel astern into the main canal, but the hawser used by Frame broke more or less often, and that

effort failed. Nothing seems to have been done by Frame after the 22d of December up to the 4th of January, 1880, which was probably due to the holidays. On the last-named date, Condon told Frame that, if he did not complete his job in a week from that time, he would terminate the contract. On the 11th January Condon gave Frame a written notice that he had employed other persons to finish the work. Condon, with his new employes, the Bakers, went to work; and by cutting a canal on the other side of the vessel from that on which Frame had cut one, and by the use of chains and other appliances, succeeded in launching the vessel on the 9th of March; that is, after the lapse of about two months from the time when Condon took the work out of Frame's hands. Condon paid the Bakers for the work done by them $600. A libel was filed by Culpepper against the schooner for the dredging done by his dredge, in which he claimed $750, including the amount of $351 due for the first service, which has been named. This claim and cost of suit was settled out of court by Condon, and the libel dismissed; the court costs in which being about $50. Frame contends that $200 of this $750 was not justly due, and that Condon should not have allowed it. Frame now brings this libel, vouching his contract of September 1st, and claiming the $1,000 named therein, or else such just compensation for his services as may of right be adjudged to him. A note has been filed by counsel for Condon since the argument at bar, contending that, as this is a claim for salvage, the libelant barred his right to sue *in rem* by entering into a special express contract for services.

There is nothing in the point made by the master's counsel. In some old cases it has been held that a special or express contract with the owners, fixing the compensation to be paid for salvage, was a bar to a libel *in rem*. But they have been overruled by more modern cases; and, except as to contracts for fixed sums payable "at all events," such is no longer the law. The point was settled by the United States supreme court in the case of *The Camanche*, 8 Wall. 448, and the ruling there has been followed by several cases in the United States courts. Desty's Shipping and Admiralty is not, and does not profess to be, an authority itself; it is an index of all decisions in admiralty, some of which are authority, and others of which are overruled cases. The contract in the case before me, as I have said, was in terms a contract for launching. It was so in fact. The repairer of a ship still on the docks may libel her, either while there, or after she has been launched. Benedict says that towing or "otherwise moving" a vessel of commerce is a maritime contract, within the cognizance of admiralty. A leading case on this subject, and an early American case, is *Read* v. *The Hull of a New Brig*, 1 Story, 244. The present case is indisputably within the admiralty jurisdiction.

I come, therefore, to consider it on the merits. The claim is resisted by the master of the schooner, Condon, on two grounds: (1) On the ground that the contract was forfeited by Frame by his failure to perform the job in a reasonable time; and (2) on the ground that Frame was without skill in the business he undertook, and, furthermore, was

not provided with the materials and implements necessary to the execution of his contract to furnish them. Condon also insists that he lost at the rate of $300 a month for all the unnecessary time that was spent by Frame about the work he undertook to do. As to this last objection no cross-libel has been filed setting up this claim. It is not a matter put in issue by the pleadings in the case, and I do not think this specific claim is properly before the court for adjudication. But, even if it were, it would depend entirely upon the decision of the question of unreasonable delay, which I am to pass upon.

Returning to the more regular grounds of defense made by Condon, and first to that of Frame's alleged dilatoriness in completing his work. It cannot be denied that Frame was bound to perform it in a reasonable time. The fact that no time was stipulated for, in a contract concerning the launching of a vessel of commerce, into which time always enters as a most important element of consideration, seems to indicate that neither party deemed it practicable to fix a time, and that the period to be allowed was left open to the determination of circumstances. I should have been disposed, nevertheless, to think the delay of four months quite unreasonable and fatal, but for what occurred after Condon discharged Frame, and undertook the job himself. Frame had effected the removal of the schooner over the ground some two lengths, and thereby shortened the distance necessary to be dredged, so as to save, according to Capt. Baker's testimony, six or seven days' work of the dredge. He had also dredged a canal from the water channel some thousand feet to the stern of the schooner, and extended it along one side of the schooner. He had thus accomplished most of the work necessary to the launching of the vessel at the time he was discharged. Not much, if any, more than 100 additional feet of dredging remained to be done when Condon took charge. Yet two months elapsed after Condon set to work before he completed the job. If these two months were not an unreasonable time within which Condon did the remaining work necessary, it does not seem to me that four months were unreasonable for the much more considerable work that Frame had directed. The work was of a character to be attended by delays, and I do not see that the delays which attended what was done in the four months are beyond proportion with those which attended what was done in the two months when Condon had direction, under circumstances creating the strongest incentives to exertion and expedition. There is the further consideration that Condon was in attendance at the schooner during the entire period of Frame's control, and does not, from the evidence, seem to have entered personal protest against the delay in any form, or even made complaint to Frame himself, until the 4th of January. As late as the 5th December he sanctioned a proceeding of Frame by joining in the contract with Culpepper for the second use of the dredge, which recognized the original contract, and continued it in operation as long as the dredge should be employed, which was until the 22d December. This acquiescence and participation by Condon in what Frame was doing certainly affords a strong implication that there was no delay before

that time to justify the forfeiture of his contract. Considered in connection with Condon's subsequent failure for two months to get the vessel off, when comparatively little remained to be done, I do not think there was such delay on the part of Frame as authorized a summary and arbitrary abrogation of the contract upon a week's notice. Solemn contracts cannot be set aside by a single party to them upon grounds so inconclusive. If Frame had himself thrown up his contract, he would have been bound by his contract, and could not have recovered any remuneration for his work and labor. But in this case it is Condon who terminates it, and it does not accord with the spirit of a court of admiralty, which is averse to the exaction of forfeitures and penalties, to allow him, by his own arbitrary act, to fix a forfeiture upon the other contracting party.

The other ground of defense is that Frame had no skill as a wrecker, and did not own the materials and implements necessary to the performance of his undertaking, which he contracted to furnish. There is no proof, and it is not a fact, that Frame held himself out as a professional wrecker. The evidence indicates, rather, that Condon knew he was a landsman, and that Condon employed him by reason of his having had some experience as a mover of houses on land. It is quite true that a man who undertakes work for a price impliedly stipulates that he has the requisite skill for its successful performance. But this rule is rarely, if ever, enforced, except in respect to professional skill, and that of experts in the mechanical trades and crafts. It does not apply to mere laborers, or to employments non-professional, and not within the mechanical trades. The launching of a vessel stranded by a phenomenal storm a quarter of a mile from the water's edge cannot be held to fall within the experience of any particular profession or craft, and is as exceptional a work as can well be imagined. I do not think that Frame can be held to have contracted impliedly with Condon that he had any experience or special skill in the art and mystery of moving ships over the land. The stipulation in the contract, that Frame should furnish the materials and implements necessary to the work undertaken, bound him to defray the expense of procuring and using those materials and implements, and was not a false holding out of the idea that he actually owned and possessed them. Contracts of the sort do not imply the ownership of such appliances. Men of enterprise often contract to do work requiring the use of herculean machinery, immensely costly, which they do not own. They depend for procuring such materials and implements very often on naught but the credit of the contracts which they enter into. If in every instance they were held to own or to possess sufficient personal credit for procuring them, then men of enterprise alone, and of no capital, would be unable to enter into any of the great operations of modern times, and the most important of these undertakings could not be prosecuted. The hiring by Frame and Condon of Culpepper's dredging-machine the second time was upon the credit of Frame's original contract, which itself was a lien upon the schooner, and Condon's joining in it attested that he considered the contract to be then in force

and binding upon the vessel, and would continue so until the dredging for which it provided should be performed, *i. e.*, until the 22d December; for otherwise he would not have signed the contract. I cannot agree that Frame's contract to furnish all the materials and implements necessary to the launching of the schooner implied that he owned, and could continually command, a dredge, or even that he would have one ready for use on every particular day on which it could be used. It is clear from the tenor of the contract that each party contemplated that the schooner was to be got off by "launching." Dredging was not in the minds of either party. Nor does it seem to have come into their minds until after the lapse of several weeks in futile attempts at launching.

On the whole case, I think Frame is entitled to a just compensation for whatever effectual work he did for the schooner. He would be entitled to compensation for the dredging done by Culpepper; but, as Condon has paid that debt, it cannot now be awarded to him. He is also entitled to a proper compensation for moving the vessel from the spot where he found her to that up to which the canal was dredged. I could not allow his actual expenditures in this part of his work. He may have spent double what it ought to have cost. I think the best way of getting at what this service was worth will be to allow him what the dredging of the canal up to where the vessel originally lay would have cost. Capt. Baker says that that distance would have required six or seven days' dredging. This at $50 a day, or $300, is what I will allow. A decree may be taken for $300, and $61.04 costs.