### THE CITY OF ATLANTA.

### THE CITY OF COLUMBIA.

### HOLLENBECK et al. v. THE CITY OF ATLANTA.[1]

### TWENTY OTHER LIBELS AND PETITIONS AGAINST THE SAME.

(District Court, S. D. New York. April 15, 1893.)

1. SALVAGE—REMOVING DANGER FROM VESSEL — LIABILITY OF VESSEL TO PAY SALVAGE.
   Where a vessel afire, to which salvage services are being rendered, is, in the operation of such services, towed away from a second vessel, in whose vicinity she has been lying, such second vessel is not liable to pay salvage on account of her release from the possible danger of catching fire.

2. SAME—VESSEL AT WHARF—FIRE—NUMEROUS TUGS.
   Where a light wooden vessel caught fire at a wharf, and was towed into the stream, and in various ways assisted by 21 tugs, but was considerably damaged, selling for but $7,100, the court, having found that the service was a meritorious one, held, that $4,000 should be awarded as salvage, which was divided among the tugs.

[1] Reported by E. G. Benedict, Esq., of the New York bar.

In Admiralty. Libels for salvage. Decrees for libelants.

Stewart & Macklin, for tugs Waite, Bogart, and others.

Goodrich, Deady & Goodrich, for the Baltic and the Bauer.

Hyland & Zabriskie, for the Agnes.

Wing, Shoudy & Putnam and Mr. Hough, for the Charles H. Runyon, Golden Rule, and four other tugs.

George A. Black, for the Imperator and the Pearl.

Alexander & Ash, for the Three Brothers and six other tugs.

Owen, Gray & Sturgis, for the two steamers.

BROWN, District Judge. The above 21 libels and petitions are filed to recover for the salvage services of 21 different tugs which were engaged in extinguishing a fire which broke out on the City of Atlanta, at about 5 o'clock in the afternoon of January 18, 1893, as she lay at her dock on the south side of the pier at the foot of Eighteenth street, East river, outside and alongside of the City of Columbia, a sister ship. Both vessels were of wood, and worth about $75,000 each. The fire arose in the lamp room of the City of Atlanta, which was on the main deck, a little aft of amidships. The ship was light, and most of the officers and crew were absent. Efforts to put out the fire with the ship's hose were baffled by the smoke, which, having little means of escape, drove back the men. The hose of the City of Columbia also could do little service. Orders were thereupon given by the mate of the latter to cut the lines of the City of Atlanta; and the bell of the City of Columbia, which had been rung as an alarm, speedily drew various tugs to the scene. The City of Atlanta lay stern out next alongside the bow of the City of Columbia. Hails were given to the tugs from a throng of men on the bow of the City of Columbia, to get out a line to the City of Atlanta and tow her away. The tug Waite, accordingly, got a line to the stern of the City of Atlanta, where it was taken and made fast by the petitioner John McQuirey, a landsman, who, at some risk, went on board the City of Atlanta to make fast the line, after those on board of her had left. The tug Bogart, arriving at about the same time, got out a hawser and made fast ahead of the Waite, and the tug White, having cut the hawser of the Atlanta which made her fast to the dock, took position on the port side of the Waite, and the three tugs then pulled the City of Atlanta stern first out into the stream. Meantime the tug Three Brothers, which had been at the head of the slip on the opposite side, came to the City of Atlanta about amidships, and began playing with her hose before and while the steamer was hauled out. After the steamer was pulled away from the City of Columbia, 17 other tugs from time to time came to the steamer and took part in the salvage service; most of them by pumping and throwing water with the hose; some by towing and holding her in position, and some by both.

The steamer was 245 feet long by 36 feet beam, and of 1,800 net tons. She was not easily managed; and the cold weather and considerable ice in the river made the work one of considerable

difficulty, exposure and hardship. With the flood tide, despite all the tugs that were pulling her could do, she drifted up a mile and a half to the lower end of Blackwell's island, where she narrowly escaped going upon the reef. With the ebb tide she drifted down again, and at about 3 A. M. was beached near the mouth of Newtown creek. During all this time the fire was not wholly subdued, but would occasionally break out afresh; and a number of the tugs remained by her until 8 or 9 o'clock the next morning, and one until the following afternoon.

After the fire was wholly extinguished, the steamer showed little signs of the fire outside, though some 40 feet of the forward part of her hull was so burned and charred, that it had to be wholly renewed. Two or three small holes only were burned through her starboard side. Inside, her woodwork was practically ruined, except in about one-third of the after part of the ship, which was not injured. After the fire she was sold and her proceeds, netting $7,100, have been paid into the registry of the court. Not only is salvage claimed against the proceeds of the City of Atlanta, but the four tugs who moved her away from the City of Columbia claim salvage compensation against the City of Columbia for saving her, when in great alleged danger, from any loss or injury by the removal of the burning ship from alongside.

1. As respects the claim against the City of Columbia, I am satisfied that no salvage award against her can be made. None of the tugs were employed by her. They did nothing directly to her, or upon her. They did not enter into her service, but into the service of the City of Atlanta. They removed the latter from alongside, because there was reasonable apprehension of danger to the City of Columbia, should the City of Atlanta remain alongside, and very likely from the additional desire of the tugs to take the whole work into their own hands free from any such co-operation of the fire department as might perchance diminish their salvage rewards. The removal was a mere incident of their mode of conducting the salvage service to the City of Atlanta, and the advantage to the City of Columbia was only an indirect benefit; not a direct service to her.

If the fire on the City of Atlanta was such as to jeopardize the safety of the City of Columbia, then she had become a dangerous nuisance; and those taking charge of the salvage of the City of Atlanta, had no right to keep her alongside the City of Columbia for their own convenience and benefit, to the peril of the City of Columbia. It was their first duty, removal being easy, to take her away where she would not needlessly imperil other property, or do it any unnecessary damage. Such removals by salvors are frequently and constantly required by those exercising powers in the nature of police supervision in the public interests; such as harbor masters, dock masters, police officers or officers of the fire department. Removals thus made in salving operations do not give rise to any claims for compensation from the property thus relieved from danger.

The removal in this case does not appear to have been ordered by any such officers; but it seems to have been done by the tugs voluntarily, upon the suggestion of persons watching the smoke of the burning ship, and adopted as a thing reasonably proper to be done. It was but an incident in the salvage service undertaken for the City of Atlanta; and it was done in the performance of a reasonable duty so to conduct the salvage operation as not unnecessarily to injure other property. Such an act is not a ground for a salvage claim against other property.

I have not been referred to any case in which one vessel has been charged with payment of salvage for an indirect advantage derived from the rendering of a salvage service to another vessel. The absence of authority is no small evidence that such indirect claims form no part of the law of salvage. If such claims were allowed on the ground that if the burning vessel were left to her fate and not removed, much other shipping might in the end be destroyed, it is plain that such claims of salvage for indirect benefits might be extended indefinitely, and would scarcely admit of any limit. But the policy of the law, which is the very basis for the allowance of salvage awards, does not require any such extension of salvage claims, but on the contrary plainly prohibits it. For it can rarely happen that the vessel to which the salvage service is directly rendered, cannot respond for all such compensation as may be necessary to secure prompt efforts to assist vessels in danger or distress. It is sufficient to allow salvage against her alone. Undoubtedly a vessel in jeopardy from some other dangerous object, may employ tugs in her own behalf to free her from danger by removing it, whether it be a burning vessel or any other dangerous object; and when such removal is clearly made as an independent act in the employment of the other vessel, and for her benefit, a salvage compensation might, perhaps, be allowed. That is not the present case; because, as I have said, the removal of the City of Atlanta was not an independent act, upon the employment or for the benefit of the City of Columbia; but it was a mere incident in the mode of performing the salvage service undertaken for the City of Atlanta, and was a duty incumbent on the salvors of the City of Atlanta as to the mode of performing that salvage service, in case remaining alongside endangered the safety of the City of Columbia.

2. The service rendered to the City of Atlanta was a meritorious one. The small amount saved, however, and the numerous tugs engaged admit of but moderate compensation to any of them. It is clear that the removal of the City of Atlanta from alongside the City of Columbia was deemed expedient and necessary at the time. Both were wooden steamers. Both had considerable light woodwork upon their upper decks; and the wind, though not strong, was from the south, which increased the danger of permitting the City of Atlanta to remain alongside the City of Columbia. In some cases the attempt to put out the fire at the dock has resulted in the destruction of both the ship and the property

on the dock. Notwithstanding, therefore, the judgment expressed after the event by witnesses who are, no doubt, competent judges, that the fire might have been in fact subdued without removing the City of Atlanta, and without setting fire to the City of Columbia, as the removal was done with the evident concurrence of all present, I think the course adopted ought to be approved, as the course deemed most prudent at the time, and as a reasonable duty to the adjacent property. This course, however, increased the difficulty of the tugs in dealing with the City of Atlanta in the currents and ice of the East river, and exposed the salvors in the cold weather to considerable hardship.

I think $4,000 will be a proper aggregate sum to be awarded for the services rendered in this case. There were great differences in the size, value and equipment of the different tugs engaged in the work, and in the length of their respective services, as well as in the time when they arrived on the scene. Some had no pump and were only of service in hauling the City of Atlanta out, and then keeping her in place, as well as they could; though the difficulty of the latter work was much increased by the lack of any concert of action, for which they are themselves to blame.

The tugs not supplied with pumps and which did towing work only, must rank lower in merit than those that did pumping; not only because pumping was the immediate means of putting out the fire, but because the labor, exposure and hardship of the pumping work in a cold winter night greatly exceeded that of towing. No diminution, however, is made as against those pumping tugs that at times did pulling at the request of the superintendent. For those that remained in attendance at the owner's request after the fire was extinguished, an additional allowance is made; and to those that broke hawsers, or suffered other damages, what is believed to be a sufficient allowance therefor is also included. Without entering into further details, I apportion the above amount as follows:

To McQuirey who made fast the lines, $30; to McNeil who has been disabled from having frozen his foot in the service, $200; to the Imperator and the Three Brothers, $350 each; to the Elder, $340; to the Runyon, $310; to the Rawson, the Golden Rule and the Golden Rod, $220 each; to the Wonder and the Rambler, $210 each; to the Agnes, $190; to the Bauer, $170; to the Waite, $140; to the Mascotte, $120; to the Mischief and the Bogart, $110 each; to the Pearl, the Vigilant and the Ceres, $100 each; to the Baltic, $90; to the White, $65; and to the Clough, $45.

Of the sums above awarded to the various tugs, two-thirds will go to the owners, and the other third to the men on board in proportion to their wages. A decree may be entered accordingly.