## THE GULFPORT.

### (District Court, S. D. Alabama. June 28, 1917.)

### No. 1634.

1. SALVAGE ⊙�longrightarrow45—SUBJECT OF SALVAGE—VESSEL CARRIED ABOVE HIGH-WATER MARK.

While a tug was in a sectional dry dock in Mobile river, owned by libelant, for repairs, certain sections of the dock in which the tug lay were driven by a violent storm which also raised the waters of the bay and river across the river and upon the land above the ordinary high-tide line where they were left. Libelant contracted with the owner to replace the tug in the river, the question of liability therefor to be later determined. *Held,* that the contract was a maritime contract, and the service one of salvage, and that a suit to recover therefor was within the admiralty jurisdiction.

2. SALVAGE ⊙�longrightarrow1—DEFINITION—"SHORE."

The word "shore," when used in the definition of "salvage," means the land on which the waters have deposited things which are the subject of salvage, whether below or above ordinary high-water mark.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Shore.]

3. SALVAGE ⊙�longrightarrow16—NATURE OF CLAIM—IMPLIED CONTRACT.

The basis of a claim for salvage compensation is a maritime contract, either express or implied by law from the voluntary rendition of the service.

In Admiralty. Suit by the Ollinger & Bruce Dry Docks Company against the tug Gulfport. On motion to set aside decree for libelant. Motion denied.

Bestor & Young and H. T. Smith & Caffey, all of Mobile, Ala., for libelant.

James A. Leathers, of Gulfport, Miss., and Palmer Pillans, of Mobile, Ala., for claimant.

ERVIN, District Judge. This matter comes on to be heard on the motion to set aside the decree heretofore rendered in favor of the libelant and to dismiss the libel for the reason, as set up in said motion, that the tug Gulfport, which was libeled for salvage, was carried by the water, as raised by the storm of July 5, 1916, high and dry on land above and beyond the ordinary high-water mark.

The facts of this case are that the tug Gulfport was in a sectional dry dock belonging to libelant for the purpose of having certain repairs made upon it, when the violent storm of July 5, 1916, came on, which raised the waters in Mobile bay and river, and through the

---

combined rising of the waters and the violence of the wind, caused various sections of the dry dock to break away from its mooring on the east bank of the Mobile river and be driven up and across the river and on the marsh on the west bank of the river above the city of Mobile. When the violence of the storm abated and the waters receded, it left three sections of this dry dock, still containing the Gulfport on the marsh above the ordinary high tide line. Libelant had these sections of the dry dock with the tug still in them removed from the land and replaced in the waters of the river. The repairs on the Gulfport were then finished by the libelant, and she was again placed in the water.

Before operations were begun by libelant looking to the replacing of the sections of the dock and tug in the water, a written agreement was entered into between libelant and the owners of the tug, under the terms of which it was agreed that the libelants should have the work of replacing the sections of the dry dock with the tug in them in the water, and pay for doing such work—

"the parties understanding that the dry dock company claims that the towboat company is liable to it to pay a part of the expenses of such removal of the docks and tug and the putting of them into the water, and the towboat company denies that there is any liability on it whatsoever to pay any part of such expenses, and this undertaking being entered into in order that the docks and tugboat may be taken off promptly and the question in dispute between the parties may be settled hereafter. The towboat company further agrees that if hereafter, it should be determined that the towing company is liable to pay some part of the said expenses and cost, then the towing company hereby agrees that the amount of liability shall be taken as $7,700.00; it being the purpose and intent of this agreement that the only matter open for litigation between the parties hereafter is the fact of liability vel non; it being agreed that if the towing company should be held liable, then the measure of such liability is fixed hereby, and no evidence to be adduced to fix the measure otherwise."

On the original hearing of this cause, objection was made that libelant could not recover because no service was rendered directly to the tug, because, the tug being in the dry dock, all the services that were rendered were to the dry dock which contained the tug, and not to the tug, and it was contended that, under the ruling in the Atlanta (D. C.) 56 Fed. 252, and the San Cristobal (D. C.) 215 Fed. 615, there could be no recovery.

The court, after discussing these cases and citing the Lackawanna (D. C.) 220 Fed. 1000, McWilliams v. City of New York (D. C.) 134 Fed. 1015, Guindon v. Cargo of Zenith (D. C.) 197 Fed. 227, A Lot of Whalebone (D. C.) 51 Fed. 916, 110 Bushels of Wheat (D. C.) 120 Fed. 432, Morse v. Pomroy Coal Company (D. C.) 75 Fed. 428, and the Neshaminy, 228 Fed. 286, 142 C. C. A. 577, entered a decree granting relief to libelants.

[1] The question raised by the present motion was not considered in the original hearing, and the sole question for consideration, therefore, is whether a boat which had been deposited by the waters raised during the period of a violent storm, upon the land at a point above ordinary high tide, is a subject of salvage, or, to put the proposition in

a little different way, has the admiralty court power to grant salvage on a commodity which has been so deposited by the water?

I have found no case in which this question is directly considered or decided, nor have the very able and industrious proctors in this case been able to do so.

In the case of The Ella (D. C.) 48 Fed. 569, it appears that the ship was, by the force of a storm, deposited on land above the high tide, and was saved, and salvage was allowed, but in that case, just as on the original hearing in this one, the question now presented was not raised or considered by the court. It was, however, held in that case that a contract to save a schooner so situated was a maritime contract.

It is urged that, as this court has no jurisdiction in marine torts unless they were committed on the navigable waters, so by analogy, if the thing saved was on land, this court has no jurisdiction.

If what was said in Ex parte Phenix Insurance Company, 118 U. S. 618, 7 Sup. Ct. 28, 30 L. Ed. 274, in speaking of a marine tort, viz., "that the wrong must have been committed wholly on navigable waters, or, at least, the substance and consummation of the same must have taken place upon those waters to be within the admiralty jurisdiction," be true, then the rule should work both ways, and if the "substance and consummation" of the act be on navigable waters, then the admiralty does have jurisdiction, even in tort.

Now, the dock containing the Gulfport was floated by use of a cofferdam and then floated into the river, so that the substance and consummation of this act was in the navigable waters; hence by analogy this court has jurisdiction.

The question of salvage has more frequently been discussed from the standpoint of what may be salved rather than from what place the thing has been salved, and therefore the discussion and definitions and expressions by the courts have been directed rather to the character of the thing salved than to the place from which it has been salved. As said in the case of Cope v. Valentine Dry Dock Company, 119 U. S. 629, 7 Sup. Ct. 337, 30 L. Ed. 501:

"If we search through all the books, from the Rules of Oleron, to the present time, we shall find that salvage is only spoken of in relation to ships and vessels and their cargoes, * * * which have been committed to, or lost in, the sea or its branches, or other public navigable waters, and have been found and rescued."

Again on page 630 of 119 U. S., on page 338 of 7 Sup. Ct. [30 L. Ed. 501], the court says:

"There has been some conflict of decisions with respect to claims for salvage services in rescuing goods lost at sea and found floating on the surface or cast upon the shore. When they have belonged to the ship or vessel as part of its furniture or cargo, they clearly come under the head of wreck, flotsam, jetsam, ligon, or derelict, and salvage may be claimed upon them."

There is no question that the tug, the subject of this libel, is such a vessel as is liable for salvage, and this is conceded. The contention, however, is that at the time the contract was made and at the time the work was entered upon to float the tug and the sections of the

dry dock, in which it was then placed, the dry dock and tug were above ordinary high tide, and for this reason not subject to salvage.

Numerous authorities are cited to show that the word "shore" means the space between high and low tide, and as the authorities speak of goods cast upon the shore being liable to salvage, it is therefore contended that if the thing be cast further upon the land than the ordinary high tide reaches, this is not on the shore, and therefore is not subject to salvage.

Admiralty courts, while not striving to increase their jurisdiction, have never been given to technical or narrow construction. The discussion by the court in the Cope Case just quoted from shows that the admiralty courts are disposed to give a liberal construction to the terms used in determining whether salvage should be granted or not. If the subject-matter is a subject of salvage, and the service is meritorious, they are disposed to make the allowance.

Now taking the quotation last made from the Cope Case, we see that if goods from a vessel are lost at sea, and cast upon the shore and saved, they are the subject of salvage. Goods ordinarily are lost from a vessel at sea in a storm. Now, if the same storm which causes the loss at sea blows up large waves and should, by the magnitude of these waves, wash the goods higher than the ordinary high tide reaches, it would be, it seems to me, a very narrow construction to say that because the very storm which caused the loss, raised waves which washed higher than the ordinary high tide, and so caused goods to be deposited on land above the reach of ordinary high tide, these goods are not the subject of salvage, though if the storm had abated and the goods had been washed upon the land by the ordinary tide instead of by the force of the storm, and had been grounded by such ordinary high tide, which then receded, leaving these goods just as dry at the time they were saved as they would have been if left by the storm waves, they are subject to salvage, though if they had been left at the height of the storm waves, they would not be. In either case, the goods when saved would be wholly out of the water, and would have been placed where found, by the action of the water, the only difference being whether they were, at the time of being found on dry land, above or below the ordinary high tide. In either case, the initial loss would have been caused by the storm.

There is no magic about the ordinary high-tide line. The true test is was the property lost on navigable waters, either by accident or by storm, and deposited on the land by such waters. Now, in the instant case, this tugboat, being the subject of salvage, and being washed ashore by the force of the storm which raised the waters of Mobile river above the ordinary high tide, we have a case identically similar to the one supposed. It would, it seems to me, be a very narrow construction to deny the right to salvage merely because the storm which washed the boat ashore caused the waters of the river to rise higher than the ordinary high tide, and thereby causing the Gulfport to be carried by the water so raised further in shore than she would otherwise have been. It would be a very narrow construction which would

give salvage where the thing saved was on dry land, though at a point between high and low tide, if it had been deposited by the waters which receded from an ordinary tide, but would deny salvage where the same waters, by force of the storm, placed the same goods upon the land, and when the storm abated, the waters receded, leaving the goods upon the land. It would be an anomaly to say that the forces of the sea could cast a ship upon the shore so high as to cast her outside of the jurisdiction of the courts of the sea. Judge Nelson, in the case of Wortman v. Griffith, Fed. Cas. No. 18,057, uses the following language:

"A distinction, to be practical, should be one of substance and one which strikes the common sense as founded in reason and justice"

—which I heartily concur in. If it were a question whether the goods were in the water or on land, an entirely different question would be presented, but to say salvage must be denied because the goods were placed upon the land by the waters when raised by storm above ordinary high tide, which then receded, seems to me to present a too narrow and restricted proposition for this court to follow. All of the proceedings of the admiralty court are based upon an enlarged and liberal construction of the spirit and purpose to be accomplished by the court within its jurisdiction. The courts of this country have shown a disposition to broaden rather than to narrow the admiralty rules in order to accomplish the purpose intended to be accomplished by these rules. This is instanced in the extension of the jurisdiction to the navigable waters, instead of to the tidal waters, and by including in the subjects of salvage floating rafts of timber and giving a maritime lien to a stevedore, and in many other ways.

"Salvage," as defined in Kennedy's Law of Civil Salvage, is as follows:

"A salvage service, in the view of the court of admiralty, may be described sufficiently, for practical purposes, as a service which salves, or helps to salve, maritime property, when in danger, either at sea, or on the shore in the sea, or in tidal waters, or on the shore of tidal waters."

[2] Now, if admiralty courts as said in Cope's Case while quoting from The Mack, 7 P. D. 126, construe the words "ships" and "vessels" in a broad sense to include all navigable structures intended for transportation, instead of giving the word "ship" the narrow construction contended for, then certainly the word "shore," when used in the definition of salvage, should not receive a narrow construction, so as to limit it to the space between high and low water mark, but should mean, it seems to me, that portion of the land on which the waters, whether by the ordinary rise of the tide or by force of the waves when raised by storms, have deposited things which may be salved. In other words, the word "shore," as used in this and the other definitions of salvage, means, and should mean, the land on which the waters have deposited things which are the subject of salvage. This comes within the definition given by Dunlap's Admiralty Practice, p. 31, where he speaks of the admiralty jurisdiction to entertain suits to recover salvage existing only in cases of maritime salvage "at sea," or

within the high and low water mark." Now high-water mark here, it seems to me, would mean not ordinary high tide, but high water either from tide or storm. The same author on page 24 says:

"It is said by Sir Leoline Jenkins that the jurisdiction of the admiralty ought naturally to arise from the nature of the cause, and not from the place where any bargain or contract is made."

This refers specifically to contracts, but is it not just as true in salvage as in contract? Some authorities define salvage as "service rendered at sea or when the vessel is wrecked on the coast." The Emulous, Fed. Cas. No. 4,480, 24 A. & E. 1183.

"It is equally a salvage service and within admiralty jurisdiction whether the service be rendered at sea or when the vessel is wrecked on the coast." 2 Parsons Ship. and Adm. p. 285.

"If a vessel is driven ashore in a gale of wind, or gets ashore by any accident, she is generally a fit subject for a salvage service." 2 Parsons Ship. and Adm. p. 288.

Again it is said:

"To entitle a salvor to compensation the article saved * * * must, at the time the services are performed, be upon or washed from the sea, or some navigable stream, and must be something used in navigating the stream or sea." The Old Natchez (D. C.) 9 Fed. 476.

If the nature of the cause is a salvage one, viz. the thing saved was imperiled either by accident or by storm, and was deposited by the water on land and was saved by the meritorious services of a stranger, should not a salvage award be made?

It is not always safe to decide a question such as this by a strict definition of the word "shore" where the authorities in defining shore did not have before them the question of salvage of boats or commodities deposited on the land by the force of the winds and waters, but had other ideas in view in making the definition.

For salvage purposes, the word "shore" should, in my opinion, be as liberally defined as the word "ship," and, as so defined, should be that portion of the land lying between low-water mark and the point at which the water, whether by the natural flow of the tide, or by stress of wind and waves, reaches.

This opinion might be stopped here, except for the contention that salvage is neither tort nor contract.

[3] In United States v. Morgan, 99 Fed. 570, 39 C. C. A. 653 (C. C. A. 4th Circ.) the question was whether a suit for a salvage service is "on any contract express or implied" within the meaning of the act of Congress, March 3, 1887, c. 359, 24 Stat. 505, giving jurisdiction of suits against the United States in such cases. The court held that such a service was on a contract express or implied with the United States, saying:

"The first question is, Is it a claim for salvage upon a contract, express or implied, or is it a claim for damages, liquidated or unliquidated, in a case not sounding in tort, in respect of which claim the party would be entitled to redress against the United States in a court of admiralty, if the United States were suable? If it be either, the court has jurisdiction. Salvage is a reasonable reward for services rendered in saving property in danger of perishing from a maritime misadventure by parties under no obligation of duty,

who voluntarily undertake the service. Maude and P. Shipp. 419; Macl. Shipp. 597; The H. M. S. Thetis, 3 Hagg. Adm. 14. It is a reward for service. And the service is rendered in the expectation of the reward. The compensation is supervised and controlled by the court of admiralty, even although there be an agreement as to the amount. The Tornado, 109 U. S. 110, 3 Sup. Ct. 78, 27 L. Ed. 874. But, it having been determined a case of salvage, the right to be compensated is recognized and assumed. It resembles the common-law contract for work and labor done. Only the compensation is allowed upon a liberal scale. Very frequently the compensation for saving property in maritime peril is given only pro opere et labore, as when it is reduced to a towage service, as in the Emily B. Souder, 15 Blatchf. 185, Fed. Cas. No. 4,458, clearly on the implied contract. In other words, the salvor renders the service upon the understanding and expectation that he will be rewarded for it, the amount of the award to be fixed by a court of admiralty, if the salvor and the owner of the property salved cannot agree. A claim for salvage is secured by a lien, and the lien cannot arise except from a maritime contract or a maritime tort. Salvage, clearly, is not a tort. When the effort to save property exposed to perils of the sea is successfully performed, an obligation at once arises upon the part of the owner of the salved property to compensate the salvor for such service."

"It has been determined that services of this character [salvage services to United States vessels and property] give rise to an implied contract." Hartford Transp. Co. v. United States (C. C. D. Conn.) 138 Fed. 618.

"The claim in this action [for salvage] is founded upon an implied contract, based upon the principle that the government has undertaken to do what it ought to do." Cornell Steamboat Co. v. United States (D. C. S. D. N. Y.) 130 Fed. 480, 482; United States v. Cornell Steamboat Co., 137 Fed. 455, 69 C. C. A. 603 (C. C. A. 2d Circ.) 1 A. & E. pp. 660, 661, 662.

"As to contracts, it has been equally well settled that the English rule which concedes jurisdiction, with a few exceptions, only to contracts made upon the sea and to be executed thereon [making locality the test] is entirely inadmissible, and that the true criterion is the nature and the subject-matter of the contract, as whether it was a maritime contract, having reference to maritime service or maritime transactions. * * * It is objected that it [marine insurance contract] is not a maritime contract because it is made on the land and is to be performed [by payment of the loss] on the land, and is therefore entirely a common-law transaction. This objection would equally apply to bottomry and respondentia loans, which are usually made on the land and are to be paid on the land." Ins. Co. v. Dunham, 11 Wall. 1, 20 L. Ed. 90.

"Contracts, claims, or service, purely maritime, and touching rights and duties appertaining to commerce and navigation, are cognizable in admiralty. Torts or injuries committed on navigable waters, of a civil nature, are also cognizable in the admiralty courts. Jurisdiction of the former case depends upon the nature of the contract, but in the latter it depends entirely upon the locality." The Belfast, 7 Wall. (74 U. S.) 624, 19 L. Ed. 266.

"On principle, it clearly cannot be the moon's attraction, the presence or absence of the tide, which determines the jurisdiction; * * * nor place or locality in matters of contract, but the subject-matter. * * * The jurisdiction can depend upon nothing, in matters on contract, but the subject-matter, the nature and character of the controversy. If that be connected with ships and shipping, commerce and navigation, the admiralty has jurisdiction, otherwise not. In matters of tort, it can depend upon nothing but that the wrong occurred upon the sea, or upon navigable waters, the places where maritime commerce is had are the places over which the admiralty has jurisdiction of wrongs." Benedict's Adm'r. (4th Ed.) § 181.

"Jurisdiction attaches in case of a maritime contract, irrespective of the question whether it is to be performed on land or water." Dailey v. City of New York (D. C.) 128 Fed. 796, 798.

"Many maritime contracts are performed on land, and by persons having no immediate connection with the sea. The services in question are maritime,

because they are a necessary part of the maritime service which the ship renders to the cargo, and without which the voyage could not be accomplished." The Onore, 6 Ben. 564, Fed. Cas. No. 10,538.

"In determining the maritime character of a contract it is not material to inquire where it was made. As long as the subject of the contract is maritime, the contract is maritime. * * * The test to be applied in determining whether a contract is maritime or not is to consider the subject-matter of the contract, and not the object." The Main, 51 Fed. 954, 2 C. C. A. 569.

"A contract to replace a schooner in the water which had been washed upon the land above the high tide line is a maritime contract." The Ella (D. C.) 48 Fed. 569.

Applying the rules above laid down to the facts in this case, I do not see how we can escape the conclusion that this contract between libelant and claimant was a maritime contract. The subject-matter of the contract was the tug Gulfport, then resting in the dry dock, which in turn rested on the marsh. The contract provided that libelant was to have this dry dock and tug removed from the land and replaced in the water, so that the consummation of this transaction would take place in the water, where the tug was at home and of right belonged.

So long as she was on the land, the tug was of no value to her owner or any one else, except for the machinery which might be taken out of her, but as a tug she had no value. As soon, however, as she was placed in the water, she then became again valuable as a tug. Claimant under this contract agrees that libelant should proceed to remove the dry dock and tug and replace them in the water.

It is further agreed that neither, however, waives anything, but that the question of liability or not should be reserved for determination by some court, the parties agreeing, however, that if liability should be found on the part of claimant that $7,700 is the amount of this liability.

The nature of the service, and not the locality of its performance, determines the jurisdiction of the court. There can be no debate, I believe, that the nature of the service in getting a vessel which lies beyond high tide off the shore and afloat is identical with the nature of the service in getting a vessel which lies below high tide off the shore and afloat. Each of the services is the same in the character of the work involved. Each accomplishes the same definite maritime benefit by restoring a vessel to the channels of navigation. Whether we call the latter salvage and the former by some other name can make no difference.

It is further argued that the facts of this case are analogous to the case of repairs made on vessels, where they are hauled up on land by marine railways; that in Ransom v. Mayo, Fed. Cas. No. 11,571, it was held that such a contract was not a maritime contract. It is true, in the opinion in that case, the court does so rule, but the libel in that case was in personam, and charged a breach on the part of the owner of the marine railway, in that he delayed in commencing the work after he had agreed to perform it, and that in hauling the vessel up the ways, by his negligence or want of proper machinery, he suffered the vessel to break from her fastening and slide down the ways into the water and sink, to the great damage of libelant, the ship. The case went up

by appeal from the Southern District of New York to the Circuit Court, where the ruling of the District Court was affirmed by Judge Nelson. Three years later, the case of Wortman v. Griffith, Fed. Cas. No. 18,057, went up from the same court, and was heard by the same circuit judge; the only difference being that the lower court had ruled that a contract between the owner of a shipyard, consisting of a marine railway, cradle, and other fixtures used for the purpose of hauling up vessels out of the water and sustaining them while they were being repaired, filed a libel in personam to recover compensation for the services rendered by the libelant in repairing a steamboat. The lower court held that the contract was a maritime one, and Judge Nelson affirmed this ruling, stating:

"The doubt I have had in the case is upon the objection raised to the jurisdiction of the court, a point not taken in the court below. It is claimed by the counsel for the respondents that the agreement for the service rendered is to be regarded simply as a hiring of the yard and apparatus; and, certainly, if this be the true character of the transaction, there would be great difficulty in upholding the jurisdiction. On the other side, it is contended that the service rendered was a service in the repairs of the vessel, and was as much a part of them as the work of the shipmaster, or the materials furnished by him. There can be no doubt that in cases where the shipmaster, owning the shipyard and apparatus, is employed to make the repairs, the service in question enters into and becomes part of the contract, and is thus the appropriate subject of admiralty jurisdiction. And the question is whether any well-founded distinction exists between a transaction of that character and the present one. The owner of the yard and apparatus, together with his hands, superintends and conducts the operation of raising and lowering the vessel, and also of fixing her upon the ways, preparatory to the repairs. The service requires skill and experience in the business, and is essential in the process of repair. I do not go into the question whether this is a contract made, or a service rendered, on the land or on the water. It undoubtedly partakes of both characters. But I am free to confess I have not much respect for this and other like distinctions that have sometimes been resorted to, for the purpose of ascertaining when the admiralty has, and when it has not, jurisdiction. The nature and character of the contract and of the service have always appeared to me to be sounder guides for determining the question."

If the Ransom Case be treated as a tort case, then there is a distinction between Judge Nelson's ruling in it and the Wortman Case, but that is the only way I can reconcile them.

In the. Vidal Sala (D. C.) 12 Fed. 207, where Judge Erskine, commenting on the ruling by Judge Nelson in the two cases just referred to, calls attention to the fact that the ruling in the case of Wortman v. Griffith was three years later, and in fact reverses the ruling in the case of Ransom v. Mayo. He calls particular attention to a portion of the quotation which I have already made from the opinion in the Wortman Case, and then states that he does not see how the two cases can be reconciled. He holds that such a contract is a maritime one and says:

"The employment cast upon the libelants by the contract required, inter alia, care and mechanical and nautical skill in its performance, and the work done must be regarded as a betterment of the steamer herself and as appertaining to marine commerce and navigation, and absolutely essential to render her seaworthy and enable her to prosecute her voyage. I think the whole contract is purely maritime. * * * So far as my researches and

information extend, this is the first time that this precise question has come before this court for decision; therefore it is to me primas impressionis. The maxim of the law is to amplify its remedies, and, without usurping jurisdiction, to apply its rules to the advancement of substantial justice; and without doubt or hesitancy, I pronounce for the jurisdiction and overrule the exceptions."

I agree with Judge Erskine that this was a maritime contract. An order will therefore be entered, overruling the motion.