THE FRANCES L. SKINNER.

(District Court, W. D. Washington, N. D. November 12, 1917.)

No. 3685.

1. SALVAGE ⊜39—LIEN FOR SALVAGE—NATURE OF SERVICE.

In order to give a maritime lien for salvage service, it must have been performed in salving property in peril on navigable waters, which might otherwise be destroyed, and must also have contributed immediately to the preservation or rescue of the property. It is a further condition that the lien claimant must have held in actual possession or kept near the imperiled property with the means at command and actually employed to preserve and save it.

2. ADMIRALTY ⊜10—SALVAGE ⊜16—JURISDICTION—MARITIME CONTRACT.

In 1907 an ocean steamship was cast on shore in a heavy storm on the coast of Guatamala, and was left on the land 100 feet from high-water mark. Five years afterward libelant and others on request of the owner, undertook to float the steamer in accordance with a plan of libelant, by excavating around it and making a canal to the sea. The machinery and appliances used were all placed on the land. After proceeding for a time with the work, it was temporarily suspended to permit libelant to go for further appliances, and on his return the owner refused to permit him to proceed or to remove his machinery. Some four years afterward the vessel was finally floated by another contractor, using, as alleged, the plan of libelant, who thereupon brought a suit in rem against the vessel, which had passed into other hands. Held that, the vessel having ceased for years to be engaged in commerce and navigation, and resting on dry land, the contract was not maritime, but was of the same nature as a contract to build a vessel, and was not within the jurisdiction of a court of admiralty. Held, further, that there was not such a continuity of service, or of offer and readiness to perform service, as would support a lien for salvage.

In Admiralty. Suit by Charles E. Wood against the steamship Frances L. Skinner, formerly the Sesostris; D. E. Skinner, managing owner, claimant. On exceptions to libel. Exceptions sustained, and suit dismissed.

Bogle, Graves, Merritt & Bogle, of Seattle, Wash., for libelant.
Hastings & Stedman, of Seattle, Wash., for claimant.

NETERER, District Judge. The libel in this case alleges that:

"In October, 1912, the German steamship Sesostris, now known as the Frances L. Skinner, was lying high and dry on the coast of Guatamala, near the Mexican border, broadside to the sea, at a point about 100 feet from the high-water mark. She had been carried on shore in a heavy storm about five years theretofore, and at said time libelant, acting on his own behalf and on the behalf of the owners named, at the request of Bruno C. Hijeres, then owner of the said ship, undertook the work of floating said steamer. He conceived and developed a plan of floating her by digging around the boat

THE FRANCES L. SKINNER 819

to the level of the sea, and then pumping out the basin around the steamer with sand pumps, relying upon the oozing in of the water around the ship through the sand for the necessary flotation of the steamer in the basin. On the steamer being floated by the plan contemplated, she would be turned head on to the sea and be moved out to deep water through a narrow canal to be dug through the sand; the sides of the canal being protected with sheath piling. ⁕ ⁕ ⁕

"During 1913 he pumped out a large basin on the starboard side of the steamer, and found that the water made its way through the sand as anticipated, and that the vessel could ultimately be floated in the manner contemplated. ⁕ ⁕ ⁕ But the progress actually made showed clearly that the vessel could be salved at reasonable cost, according to the plan adopted by libelant, and she subsequently was salved in pursuance to such plan."

It is then alleged that, after performing certain labor in carrying out the conceived plan, libelant left the vessel, with the owner's consent, and came to the United States for the purpose of getting additional appliances and means with which to prosecute the work, and returned in January, 1914, when the owner refused to allow the libelant to continue the work or do anything further in or about the salvage of the steamer, and refused to surrender to libelant his engines, boilers, pumps, piping, and other salvage equipment and material, but appropriated all of such appliances and materials to his own use, and proceeded to use them in efforts to salve the steamer in accordance with the plan first conceived and first put into operation by libelant. The efforts of the owner, however, were not successful; but in 1915 and 1916, as the libelant is informed, other salvors, including the British Columbia Salvage Company, Limited, continued the salvage operations on the steamer in pursuance to the plan conceived and adopted by the libelant. It is alleged that libelant succeeded to the interest of his associates.

The claimant excepts to the libel, on the ground that the vessel at the time of the alleged salvage service was not at sea, or on the coast of the sea, nor within public navigable waters, nor on the shore thereof; that it was not engaged in maritime commerce, or capable of being so engaged; that the service alleged to have been rendered was not in "salving property from any peril of the sea"; that such service was rendered entirely upon land; that the said steamer, while upon dry land, 100 feet from shore, where it has remained for more than five years, was not subject to salvage service, and there is no maritime lien in favor of the libelant for the salvage.

[1] In the absence of statute, the finder of a thing lost on land belonging to another has no lien upon it for services performed or expenditures made in preserving the property and finding the owner; but, from consideration of public policy and commercial necessity, maritime law has established different rules for property which is lost at sea. The Supreme Court of the United States (The Blackwall, 10 Wall. 1, 19 L. Ed. 870) said:

"Salvage is the compensation allowed to persons by whose assistance a ship or her cargo has been saved in whole or in part from impending peril on the sea, or in recovering such property from actual loss, as in case of shipwrecks, derelicts, or recapture."

The universal rule, however, is that, before a maritime lien can attach, the property must be salved from the perils of the sea. As Judge

Betts, in The Perseverance, 19 Fed. Cas. No. 11,017, at page 308 (No. 11,017), said:

"The essential requisite of a contract, to bring it within the jurisdiction of an admiralty court, is that it must be one which is to be performed on the high seas, or which has relation to a maritime service. The most enlarged interpretation of the term 'maritime,' as applied to the jurisdiction of this court, has not been extended beyond subjects or engagements which are necessarily connected with services to be rendered on tide waters. * * * "

Salvage service, it is said in Sonderburg et al. v. Ocean Towboat Co. (Woods et al. v. Same) 3 Woods, 146, Fed. Cas. No. 13,175:

" * * * Is a reward for a meritorious service performed in saving property in peril on navigable waters, which might otherwise be destroyed, and is allowed as an encouragement to persons engaged in business on such waters, and others, to bestow their utmost endeavors to save vessels and cargoes in peril."

Judge Dillon, in Salvor Wrecking Co. v. Sectional Dock Co., 21 Fed. Cas. at page 283 (No. 12,273), said:

"The admiralty jurisdiction, and peculiar liens, rights, and remedies which the admiralty recognizes and enforces, spring out of the movable character of the vessels and vehicles which are instruments of navigation, commerce, and trade."

An indispensable ingredient of salvage service is having contributed immediately to the preservation or rescue of property in peril at sea. In November, 1846, the John Wurts was discovered floating on Sandy Hook Bay, bottom up, dismantled, filled with water, and deserted, by the sloop Hickory. The sloop was not able to tow the wreck, and came to the masters of the schooners Elizabeth, David Cromwell and Vinyard, and it was agreed that they and the crew of the sloop should proceed to the wreck and tow her to port, and through their efforts it was taken to Staten Island. It appears that prior to this time, on the 8th or 9th day of September, on a voyage from the North River and New York, below Sandy Hook, the John Wurts was wrecked and all on board perished. The claimant was also owner and master of the cargo, and shortly after her loss, employed the schooner Excelsior and other vessels with a steamboat, to endeavor to save the wreck and cargo. They succeeded in raising her and towed her several miles, when she escaped from them and again sank under 10 fathom water, her bows in the sand, and her stern just out of the water. All of the expense of these proceedings was paid by the claimant, except those of the schooner Excelsior. On the 24th day of September, an agreement in writing was entered into by the claimant and managing owner of the Excelsior that the Excelsior would undertake the salvage of the vessel and cargo and to deliver them near Jersey City for 50 per centum on the amount saved, and that allowance should also be in full compensation for services already rendered by his vessel and crew under the employment of the claimant. About the 6th or 7th of October, with apparatus prepared to raise it the Excelsior proceeded to the wreck and passed a large chain under its stern, but she had not force enough to move it; the chain was secured around the wreck and the Excelsior and her crew went back to the city for further assistance. They had been engaged about

twelve hours in this service. On the 13th of October, the Excelsior and another vessel started to go to the wreck again, but were driven off by a heavy gale of wind. A day or two after the wrecked schooner was seen drifting to the eastward, past Fire Island, and was subsequently reported off the east end of Long Island. After a heavy blow from the eastward she was again seen drifting to the westward, past Fire Island, towards the New Jersey shore. When information was received of this last movement of the wreck, the Excelsior was sent to Fire Island to search for it, but could discover nothing of it. The Excelsior was then engaged by the owners in another wrecking adventure near Fire Island. The Excelsior was after that further dispatched to New York Bay in search of the schooner, but without success. On the 9th of November, the libelants fell in with the schooner, as stated. Judge Betts said:

"Upon the facts in this case the claim of Jones and owners of the Excelsior to salvage cannot be allowed. It lacks the indispensable ingredient of salvage service, that of having contributed immediately to the preservation or rescue of the property in peril at sea. The circumstances in proof do not demand of the court a decision upon the point, how far a person must be directly employed aiding the recovery of a wreck to constitute him a salvor. Nor am I disposed to lay down the rule that he must make it certain the property was saved by his assistance; but I am not aware of any principle which invests him with the rights and privileges of a salvor, until it is rendered reasonably probable upon the evidence that his labor or skill have contributed towards protecting property exposed to instant peril at sea from ultimate loss or further damage." The John Wurts, Fed. Cas. No. 7,434.

And again:

"The right of a salvor results from the fact that he has held in actual possession or has kept near what was lost or abandoned by the owner or placed in dangerous exposure to destruction, with the means at command to preserve and save it, and that he is actually employing those means to that end."

[2] It is contended by the libelant that it is immaterial whether the vessel was within the ebb and flow of the tide, or not, nor as to the time it lay upon the beach above the high-water mark; that the libelant conceived the plan to rescue the ship and with the owner's consent proceeded to carry out the plans for a time; and that the owner's intended use for the vessel was for trade and commerce upon the high seas, and is within the admiralty jurisdiction, and places emphasis upon The Old Natchez (D. C.) 9 Fed. 476, The Genesee Chief, 12 How. (53 U. S.) 443, 13 L. Ed. 1058, The Steamship Jefferson, 215 U. S. 130, 30 Sup. Ct. 54, 54 L. Ed. 125, 17 Ann. Cas. 907, and The Ella (D. C.) 48 Fed. 569. In the case of The Old Natchez, salvage was claimed for services rendered to a dismantled steamboat moored on a navigable river undergoing repairs for the purpose of being fitted for use as a wharfboat. The court said:

"Salvage is compensation for a maritime service rendered in saving property or rescuing it from impending peril on the sea, or on a public navigable river or lake, where interstate or foreign commerce is carried on."

The Genesee Chief was a proceeding in rem to recover damages occasioned by a collision on Lake Ontario, and the issue determined was that admiralty jurisdiction extends to the navigable rivers and

lakes of the United States without regard to the ebb and flow of the tides of the ocean.

In The Jefferson, the court merely held that a vessel used for navigation and commerce does not cease to be subject to admiralty jurisdiction because temporarily in a dry dock without water actually flowing around her; in this case the recovery was sought by persons rendering assistance in extinguishing a fire on the Jefferson while she was in a dry dock, these parties operating from a boat in the tidewater.

The Ella, supra, during an extraordinary storm in August, "was carried 1,200 to 1,500 feet beyond the ordinary water's edge and beached on the shore of the Elizabeth river, near Norfolk, far beyond the reach of the tide." In September following the master, for an agreed price, secured a contractor to launch the schooner, who promptly began working, and "in several weeks moved her about twice her length," and then abandoned the adopted plan of operation and employed a dredge to dig a canal, and launched her on the 9th day of March, following. The court (48 Fed. 571) said:

"Benedict says that 'towing or "otherwise moving" a vessel of commerce is a maritime contract, within the cognizance of admiralty.'"

Emphasis was placed in this case upon the phrase "otherwise moving," and no doubt held to apply to the vessel in or out of the water. I do not think that Benedict could have intended to mean that "otherwise moving" could apply to any moving of the vessel other than in the water; "towing" is an act which can be performed only in the water, and "otherwise moving," under the rule ejusdem generis, must mean moving in a like manner, or like condition, as can be employed by towing, and the moving must have relation to some power applied in the water, or efforts which are not disassociated therefrom. The schooner Ella was, however immediately engaged in commerce, which had been interrupted by the storm, and at once libelant proceeded with the work of rescue. In the instant case the vessel was cast upon the shore in 1907, and five years thereafter the libelant and others, "at the request of * * * the then owner of the ship, undertook the floating of the steamer."

The libelant in the instant case was not engaged in a business on the sea or connected therewith. He conceived the plan, and employed stationary machinery and appliances. The vessel was not exposed to any immediate peril of the sea; the peril had long since passed; there is no allegation of exposure to peril; she had long been withdrawn from commerce; there was no "spontaneous meritorious service performed" in the protection of the property. The only claim that can be made to admiralty jurisdiction is the fact that the vessel was cast upon the shore by the sea. Conceding that in the first instance the matter may have been within the admiralty jurisdiction, did the relation of the vessel to this jurisdiction change when the sea receded, and commerce was abandoned? The law looks to the proximate and not remote cause as the source of jurisdiction. The Supreme Court of the United States, in The Jefferson, 20 How. (61 U. S.) 393, at page 401, 15 L. Ed. 961, said:

"The admiralty jurisdiction, in cases of contract, depends primarily upon the nature of the contract, and is limited to contracts, claims, and services, purely maritime, and touching rights and duties appertaining to commerce and navigation."

Admiralty jurisdiction does not extend to the building of a vessel or work upon or materials furnished in the construction. The Jefferson, supra; The Winnebago, 205 U. S. 354, 27 Sup. Ct. 509, 51 L. Ed. 836.

Was the service performed of the same character and in the same class as services performed in building the vessel, under the circumstances applicable to this vessel? The intention to engage the vessel in course of construction in commerce is as strong as was the intention to re-enter the vessel in issue in commerce. At the time of the contract the vessel bore the same relation to the sea as a vessel under construction. The allegations as to labor performed are indefinite, and appear more of an experimental character than services to rescue. The machinery and appliances employed are stationary, and have no maritime relation. The recovery is primarily based upon the plans conceived and outlined, which it is alleged to have afterwards been adopted. The last work done was at the close of the working season in 1913. An effort was made to resume work in January, 1914, but was denied by the owner. No further services were rendered or efforts made with relation to the claims in the libel. The libelant has not held actual or constructive possession, nor kept near the vessel, ready to engage in the work of rescue, and did not resume the work, or offer so to do, when the owner failed in his efforts and the British Columbia Salvage Company, Limited, was engaged. There is not that continuity of relation between the libelant and the vessel, from 1913–14 and the launching of the ship in 1917, as to support a maritime claim, and the claim, if any, is "stale," and may not be asserted in admiralty.